STATE, Respondent, vs. KETCHUM, Appellant.

*December 5, 1952—January 6, 1953.*

For the appellant there was a brief by *Maurice Schmerling,* attorney, and *Eugene J. Sullivan, Dennis M. Sullivan,* and *Arthur T. Spence* of counsel, all of Milwaukee, and oral argument by *Mr. Dennis M. Sullivan* and *Mr. Schmerling.*

For the respondent there was a brief by the *Attorney General* and *William A. Platz,* assistant attorney general, and oral argument by *Mr. Platz.*

MARTIN, J. The complaint against appellant was made April 20, 1951, and a warrant issued. Preliminary hearing was held May 2, 1951, and appellant was bound over for trial. On October 8, 1951, before arraignment, appellant served and filed an affidavit of prejudice against ALFRED L. DRURY, judge of the circuit court, and applied for a change of venue on account of community prejudice.

On October 11, 1951, the motion for change of venue came on for argument before Judge DRURY, and on the adjourned date, December 26, 1951, Judge DRURY denied the motion and set the case for trial. On January 7, 1952, with ARTHUR

W. KOPP, circuit judge, presiding, appellant filed a motion to dismiss the information on grounds of insufficient evidence to establish probable cause, which motion was denied. No other motion was made by appellant at that time, nor was any objection made to proceeding to trial on the ground that Judge DRURY had no jurisdiction on December 26, 1951, to decide the motion for change of venue.

It is the opinion of this court that if, as appellant now contends, Judge DRURY was without jurisdiction to decide the motion and the proceedings before him were void under the cases cited by appellant, said motion was pending when the case went to trial before Judge KOPP. In failing to renew the motion at that time, however, and in proceeding to trial without objection, defendant waived the motion for change of venue. He cannot argue that rights secured to him were denied by the trial court, when such rights could have been preserved had he renewed the motion before Judge KOPP at the time the case went to trial.

Appellant's second assignment of error is that the trial court permitted the special prosecutor to testify. The testimony complained of was given by Mr. Bode, the acting district attorney, in connection with the introduction into evidence by the state of a catheter claimed to have been given to the deceased by appellant. Felix Hostnick had testified that the catheter in question resembled one he had seen in the possession of Mrs. Bohleen, the decedent, when he took her to appellant's home two days after the alleged abortion. The testimony by Mr. Bode was to the effect that he had delivered to the director of the state crime laboratory the envelope containing the catheter which was found in Mrs. Bohleen's effects after her death.

Appellant cites cases holding that testimony by a district attorney in an action which he is prosecuting offends the canons of ethics, but Canon 19 of the American Bar Association Canons of Professional Ethics provides:

"When a lawyer is a witness for his client, *except as to merely formal matters,* such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. . . ." (Italics supplied.)

Since Mr. Bode's testimony related only to the formal matter of his custody and delivery of the article in question, we see no error in admitting it.

Appellant's third contention is that he was entitled to a mistrial because of the state's attempt to introduce evidence of other offenses allegedly committed by appellant. In the questioning of Felix Hostnick by the district attorney, the following took place:

"*Q.* Did he—any further conversation about prior operations that he had performed before?
"Eugene Sullivan: That is objected to—
"*A.* Yes, he has done numerous—"

Again objection was made that the questioning was prejudicial and appellant's counsel asked that the court declare a mistrial. The court then said:

"Well, Mr. District Attorney, there was a prejudicial question asked that you should not have included, but I deny the motion of a mistrial but I wish to instruct the jury that any reference or any intimation in that question of any other cases on the part of the defendant should not be considered by you at all. There is no proof here that this defendant had ever had anything to do with any other person and unless there is evidence in some way you should not consider that question. Now proceed and ask proper questions, Mr. District Attorney."

In our opinion, any prejudicial effect which may have been given by the questioning about "prior operations" was cured by the court's instruction to the jury to disregard it.

The questioning continued:

"*Q.* Did you have any further conversation with Mr. Ketchum on that day when you returned subsequent to the

death of Mrs. Bohleen? *A.* He said that it is too bad. He said, 'Those things happen very seldom that it happens this way, but it happened this time,' something to that effect."

And upon objection by appellant's counsel, the court ruled:

"There is no evidence in that question of any attempt by counsel. He cannot control the answer the witness made. Let it stand. The question was proper. . . ."

We cannot see that this question was improper. In fact, the same question had been asked of the witness a short time before, as follows:

"*Q.* Will you tell us what you said to Mr. Ketchum that day? *A.* I said, 'It is regrettable.' I said, 'Mrs. Bohleen died.' "

Counsel's objection then was:

"That is objected to as being self-serving, a declaration made by him to Mr. Ketchum.

"The Court: Overruled. You may give the conversation whether it is self-serving or otherwise.

"The Witness: Mrs. Bohleen died. What happened? 'Well,' he said, 'Sometimes it happens; very seldom it does happen.' Then he said there is nothing I could do and nothing he could do so I left."

Appellant's counsel made no objection then that such examination was improper as an attempt to establish the commission of other similar offenses. The answer given by the witness, tending to show that appellant had knowledge of or experience in such matters, was an admission against interest, and admissible.

It is next contended that it was error to allow the district attorney to cross-examine as to prior convictions of the appellant. Upon direct examination the appellant testified:

"*Q.* Have you ever been arrested and convicted of a criminal offense? *A.* Yes."

Referring to such testimony on cross-examination, the district attorney asked:

"*Q.* You testified on your direct examination you were convicted of a crime. *A.* I answered 'Yes.'

"*Q.* How many times? . . .

"Eugene Sullivan: I object to the form of the question and to counsel's inquiry under the *Adams Case.*

"The Court: He may answer, the number of times. Do not ask what it was for. That has been passed on very recently by our supreme court.

"*A.* Twice."

Appellant argues that the introduction of evidence such as this constitutes prejudicial error under the decision in *State v. Adams* (1950), 257 Wis. 433, 43 N. W. (2d) 446. In that case the defendant had testified on direct examination to four previous convictions. In his cross-examination on that subject, the district attorney referred to the nature of such previous offenses, which happened to be the same as that for which defendant was then being tried. In holding that the trial court erred in permitting such inquiry, this court did not hold that the number of convictions may not be brought out. The error was in allowing the state to go beyond the proof of mere conviction to show the nature of the offense upon which it was had.

In this connection appellant also contends that the testimony of a deputy sheriff that he first met appellant in the county jail constituted prejudicial error. The court properly instructed the jury to disregard this evidence since it was competent only for purposes of impeachment and the appellant had not yet testified. Since it was later established that appellant had been previously convicted of crime, we cannot see that appellant was thereby prejudiced.

Appellant's final contention is that there is no credible evidence to sustain the verdict because the state's case depended solely upon the uncorroborated testimony of Felix Hostnick, an accomplice. In the first place, the credibility of the witness was for the jury, *Varga v. State* (1930),

201 Wis. 579, 230 N. W. 629, and it was properly instructed as to his testimony:

"I instruct you that the witness Felix Hostnick is what is known as an accomplice and you should scrutinize his testimony with the utmost care and caution, and ordinarily you should not convict upon such testimony unless fairly corroborated by other credible facts and circumstances beyond a reasonable doubt."

It is not necessary to discuss the evidence at length. Briefly, Hostnick's testimony was that after a period during which he and Mrs. Bohleen were intimate, she told him she was pregnant and wanted to be relieved of her condition. At her request he obtained some quinine sulphate, which apparently did not produce the desired result. When she insisted on having something done he made inquiries which led him to appellant. On March 10, 1951, he saw Ketchum and made arrangements with appellant to perform an abortion for a fee of $100. On the morning of March 12th he called for Mrs. Bohleen at her home and took her to Ketchum. Ketchum and Mrs. Bohleen went into an adjoining room and after ten or fifteen minutes they returned to the living room and "Ketchum said that it would be about twenty-four hours when this thing would be over with and probably she would be slightly ill but no bad effects." Mrs. Bohleen then took $100 from her purse and gave it to Ketchum. Hostnick further testified that because "Mrs. Bohleen complained about losing this catheter," they went back to Ketchum on March 14th. She produced a catheter from her purse, which Ketchum said he could use, and then they went to the other room where they remained about ten minutes.

Mrs. Bohleen came home from work ill on March 21st. Hostnick learned of it and visited her at her home on the 25th, Easter Sunday. On March 26th she was taken to the hospital where he visited her several times.

Mrs. Bohleen died in the morning of April 4th. That afternoon a post-mortem was performed by Dr. Hugh Wilson, who testified that she died of uremia; that in his examination he found proof that she had been pregnant; that the condition of the kidneys showed she had a specific lesion which, in his opinion, was an incomplete abortion with infection. He stated that the insertion of a catheter could cause such infection. At the time of the post-mortem he did not find that there had been a catheter used at any time, but he stated that it would be difficult to determine whether one had been used unless it had perforated the uterus; if it had not, it would not leave any mark of its presence. The doctor further testified that quinine could cause the destruction of red cells and produce uremia, but that such instances are extremely uncommon.

In our opinion, the testimony of Hostnick is not incredible and it was at least partially corroborated. .Mrs. Bohleen's sisters, with whom she lived, testified that Hostnick took Mrs. Bohleen out once or twice a week, always on the evening of her day off which was usually Monday; that it was Mrs. Bohleen's custom to take her son to school between 8:30 and 9 in the morning, return between 9 and 9:30 and leave again for work at 11; that on March 12th she dressed up in her good clothes, Hostnick called for her about·8:30 and Mrs. Bohleen explained she was going to town with Hostnick; that she came into the house alone that day between 11 and 12:30 noon.

Hostnick's testimony as to Mrs. Bohleen's possession of the catheter was likewise corroborated by the sisters who found it in the decedent's personal effects after her death. They also testified to finding quinine pills, a box of dark-colored pills, and a slip of paper on which was written a telephone number later identified as being that of the place where appellant lived.

The findings of Dr. Wilson on the post-mortem corroborate Hostnick's testimony that an abortion was performed.

In any event, it was for the jury to determine whether Hostnick's testimony was credible or not under the circumstances.

The record shows that the trial court approved the verdict, and we see no reason why it should not stand.

*By the Court.*—Judgment affirmed.