BEAUREGARD, Plaintiff in error, vs. THE STATE, Defendant in error.

*April 12—May 2, 1911.*

*Criminal law and practice: Homicide: Degrees: Submission to jury: Review on appeal: Manslaughter: Dangerous weapon: Involuntary killing: Instructions to jury: Prejudicial errors: Intent to kill: Presumption: Waiver of instructions.*

1. In submitting a homicide case to the jury the trial court must necessarily pass upon the question as to what degrees are involved and shape its instructions accordingly; and its decision on that question will not be disturbed on appeal unless it is clearly wrong and clearly may have prejudiced the accused.

2. Omission of the trial court to submit to the jury a certain degree of murder or manslaughter need not be reviewed by the appellate court unless there was a formal request for such submission and an exception was duly taken to the denial thereof; but the appellate court may consider such an omission although there was no such request or exception.

3. A criminal homicide falling within any grade higher than manslaughter in the fourth degree cannot be of that degree.

4. A killing of a person by blows on the head with a gun barrel separated from its stock is a killing by a dangerous weapon.

5. When such blows were inflicted voluntarily, regardless of consequences, although without any specific intent to cause death, the killing was not involuntary, within the meaning of sec. 4362, Stats. (1898), defining manslaughter in the fourth degree.

6. An instruction that if the jury find the evidence of any witness is wilfully false in any particular they may reject entirely the evidence of such witness (omitting the words "which is not corroborated by some credible evidence") is erroneous, and in this case was prejudicial because it may well have led to a different result than would otherwise have been reached.

7. Upon the question whether a homicide was characterized by the specific intent to take human life essential to murder in the first degree, an unqualified instruction that the law presumes that defendant intended the consequences of his acts, was erroneous and was prejudicial where the acts were not such as would necessarily or generally cause death.

8. When the character of an act causing death is known, the specific intent to effect such result will not be presumed unless it

was the necessary, probable, usual, or ordinary result of such act.

9. The evidence in this case showing the circumstances under which the accused struck the deceased upon the head with a gun barrel, though not showing a case of self-defense, is *held* not to show a premeditated design to effect death so as to warrant a conviction of murder in the first degree.

10. The defendant in a criminal case may waive the giving of instructions upon any material point by failing to make any request therefor.

ERROR to review a judgment of the circuit court for Bayfield county: JOHN K. PARISH, Circuit Judge. *Reversed.*

Plaintiff in error was, in due form, charged with having, at Bayfield county, Wisconsin, on the 2d day of December, 1909, with premeditated design to effect such end, committed the crime of murder in the first degree by taking the life of Louis Mitchell. He was tried on the issue of not guilty, resulting in his being convicted of the full offense named, and was, accordingly, in due form, sentenced as required by law, questions discussed in the opinion being saved for review in this court.

*A. W. McLeod,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Messerschmidt.*

MARSHALL, J. The following appeared on the trial without substantial controversy: On the night of December 2 and 3, 1909, the accused,—a tall strong man about twenty-five years of age,—his aunt, a woman about fifty years old, known as "Quiz," her husband, Louis Mitchell, a man about seventy-five years of age, Maggie Sullivan, Mrs. Mitchell's aunt—an old lady,—and a small boy, the son of Mitchell and wife, were at the latter's home in the woods quite a distance from other habitations. They were all partly of Indian blood. The house was a small affair, having, in the main, one room on the ground and some room above reached by a ladder and used

for sleeping purposes.    The room on the ground floor was furnished with a cooking stove, heating stove, table, chairs, a. bed, and some other things.    Mitchell was of an irritable disposition when under the influence of intoxicating liquor.    All the adults were accustomed to the use of such liquor.    On the evening in question, Mitchell and the accused came in about 8 o'clock.    They had been away a short time hunting.    They stopped on the way back at a place where liquor was kept for sale, drank some and bought a quantity, which in bottles and a small jug they took home.    After arriving there and taking supper, they and the two women drank quite freely, all becoming more or less intoxicated.    The old lady, some time before 12 o'clock, made for herself a bed on the floor near the box heating stove, where she retired and soon fell into so sound a slumber that the disturbances hereafter detailed did not awaken her.    Some time during the evening the accused fell asleep, either up stairs, or sitting in a chair or lying on the floor below.    Mitchell and his wife remained awake long into the night, the former at times sitting on the floor and singing songs and, generally, acting the part of a man alternately hilarious and quarrelsome from the effects of the whisky he had drank.    While the two were so alone Mrs. Mitchell became so stupefied from drink and an assault upon her by her husband that, after the instant of such assault till aroused by the movements of Mrs. Sullivan the next morning, she was not sensible of anything which occurred.    Somewhere near midnight, probably thereafter, Mitchell, in anger over some trivial matter, assaulted his wife, striking her several times with a gun, knocking her senseless and considerably injuring her.    When she was struck she made an outcry in terror, calling for her mother or the accused.    The disturbance and outcry aroused the latter from his drunken sleep, causing him to immediately come upon the scene.    He at once observed his aunt on the floor, apparently dead, her face covered with blood, and Mitchell near by with a gun in his

hand. The latter, immediately, in a very angry mood and threatening dire results, attempted to beat accused with the gun. The latter grabbed the weapon out of the former's hands. At this instant, or in the assault on the woman, the gun barrel was separated from the stock, so the accused obtained only the former. Immediately he struck Mitchell three times on the head with the gun barrel knocking him senseless. Mitchell probably fell on receiving the first blow. One blow was delivered on the right side of the head above the top of the ear at a point near the upper part of the skull, one on the opposite side not quite as high up, and one back of the angle of one eye to a point near the back part of the head. Immediately after the assault the accused left the premises, going quite a distance to the place of one Holmes where he remained till on the next day he was informed of Mitchell's death. Thereupon he returned to the scene of the homicide and remained there till he was arrested. The particular evidences in the room where the homicide occurred, when visited the day after, were the broken gun on the floor, the dead body of Mitchell lying face down thereon, and the presence of Mrs. Mitchell with severe bruises upon her person. The accused made no attempt to avoid arrest or conceal the fact that he caused Mitchell's death. He related the circumstances of the homicide freely, claiming that he acted in self-defense and to avenge the assault upon his aunt whom he supposed had been murdered by Mitchell. He was a much stronger man than deceased, and could readily have defended himself without using a weapon, as he did. He said he did not intend to kill Mitchell but purposed scaring and punishing him for what had been done to Mrs. Mitchell; that when he left the house he did not suppose Mitchell was dead. The blows were not hard enough to fracture his skull. They produced concussion of the brain and a blood clot on each side under the table of the skull, causing death.

The questions presented for consideration are few and quite simple. We will treat them in detail.

Complaint is made because manslaughter in the fourth degree was not submitted, the claim being that if the accused was guilty of any homicidal offense the jury might, on the evidence, have reasonably come to the conclusion that it was of that low grade.

A case falling within any grade of criminal homicide above the second phase of manslaughter in the fourth degree is excluded therefrom. *Doherty v. State,* 84 Wis. 152, 53 N. W. 1120. One falling within any grade above the first phase of such fourth degree cannot be of the latter nature. *Doherty v. State, supra.* The trial court in submitting a homicidal case to a jury must, necessarily, pass on the question of what degrees, in any reasonable view of the evidence, are involved, and shape the instructions accordingly. His decision in that regard cannot be disturbed on appeal unless clearly wrong and, clearly, may have been prejudicial to the accused, and then the matter need not, necessarily, be reviewed unless the question in regard thereto was properly preserved and brought to the attention of the reviewing court.

Technically, the complaint under discussion might be passed under the last clause of the foregoing. However, the case is of such serious character, it is thought best to consider it as if a formal request had been made upon the trial for submission to the jury of manslaughter in the fourth degree and an exception had been formally saved to the refusal to do so.

On the evidence it appears that the accused unnecessarily killed Mitchell, either in resisting an unlawful act of the latter or immediately after such act had failed, and in close connection therewith, satisfying the essentials of manslaughter in the second degree. For that reason if for no other, the court properly refused to submit manslaughter in the fourth degree, because if there were added circumstances removing the homicide from such degree, not rendering it jus-

tifiable or excusable, they necessarily gave the offense the character of some degree above the fourth.

For instance, the weapon used, considering it was purposely laid with much force on a vital part of Mitchell's person and in a way to naturally produce his death, was obviously a dangerous one, satisfying, except for the element of "heat of passion," the calls of manslaughter in the third degree, and excluding the offense on that ground from the first phase of manslaughter in the fourth degree. It will be noted that the element of heat of passion is common to both degrees; also, that of killing with a weapon, the distinguishing characteristics between the two being that in the third degree the weapon must be dangerous and in the fourth not so; *Keenan v. State,* 8 Wis. 132; and in the latter the homicide must be involuntary and in the former voluntary.

In the latter respect mentioned the offense in question did not fall within the field covered by the fourth degree. *Johnson v. State,* 129 Wis. 146, 108 N. W. 55. If one purposely assaults another with a dangerous weapon in a way to naturally, and according to the ordinary course of things, inflict great bodily harm, and within reasonable probabilities, at least, cause death, and death ensues, the result is voluntary, not in the sense that it was intended, but that the act was intentional and perpetrated with such disregard of consequences as to negative the idea that what followed was accidental. The logic of *Johnson v. State, supra,* following *Keenan v. State,* 8 Wis. 132, and the general trend of authority on the subject and correcting the mistake made in *Schlect v. State,* 75 Wis. 486, 44 N. W. 509, will be found illustrated by numerous cases decided in other jurisdictions, of which the following are but a few: *Smith v. State,* 73 Ga. 79; *State v. Cantieny,* 34 Minn. 1, 7, 24 N. W. 458; *Conner v. Comm.* 76 Ky. 714, 718; *Trimble v. Comm.* 78 Ky. 176; *State v. Trusty,* 1 Pennewill (Del.) 319; *State v. Jones,* 2 Pennewill (Del.) 573; *State v. Miller,* 9 Houst. (Del.) 564;

*Comm. v. Gable,* 7 Serg. & R. 423, 427; *Johnson v. State,* 94 Ala. 35, 10 South. 667.

Some of the decisions referred to were under statutes, varying, somewhat, from ours on the subject of criminal involuntary taking of human life, but all support the idea that where the act is voluntary and regardless of consequences, especially if with a dangerous weapon, it is felonious, in that it is liable to do great bodily harm, and regarded as so intended, actually or constructively, and liable to cause death, though without any specific intent to produce such result; and if such result follows, it is impressed with and takes the character of the act itself, as to whether voluntary or involuntary, thus excluding the idea of the killing being within the grade of homicidal offenses described as manslaughter in the fourth degree. So the trial court properly refused to submit such degree to the jury.

Error is assigned because the trial court instructed the jury in this language:

"If you find that the evidence of any witness is wilfully false, in any material particular, then you may, if you see fit, reject the evidence of such witness entirely."

The criticism is that the words "material particular" were used instead of "any material fact;" or "matter material to the case," or "any material matter in issue," and omitting the words "which is not corroborated by credible evidence" or some plainly equivalent words. Some other departures in phrasing the rule the trial court evidently attempted to give, from the way many times approved or suggested by this court, might well have been mentioned. On the whole, the instruction given is very faulty and in one respect prejudicial. The term "any material particular" is perhaps a fair equivalent for "any material fact" or "matter material to the issue," but why try to invent new methods of stating the simple rule so well understood and so easily stated, without the slightest risk of committing error, if only the history of the subject in

·this court from the 3d Wisconsin down to date is followed?
Why even use the term "evidence of any witness is wilfully
false" instead of "any witness testified wilfully falsely," or
which is better, "testified knowingly falsely?" ·Omission of
the words "which is not corroborated by some credible evi-
dence" is the plainest of error.    Instructions affected by such
·error have been condemned many times as harmfully wrong.
·Such words are absolutely necessary to a correct statement of
·the rule.    Moreover, it is necessary to give the rule in a case
where it applies and specific request is made therefor.. Failure
·to give it and with substantial correctness, when properly re-
quested, might or might not be fatal in the event of the one
requesting it being the losing party, according to whether .the
case is or is not such as to render it probable the refusal may
have affected the result injuriously to such party.   *Mercer v.
Wright,* 3 Wis. 645; *Morely v. Dunbar,* 24 Wis. 183; *Allen
·v. Murray,* 87 Wis. 41, 46, 57 N. W. 979; *Bratt v. Swift,* 99
Wis. 579, 75 N. W. 411; *Patnode v. Westenhaver,* 114 Wis.
460, 90 N. W. 467; *Richardson v. Babcock,* 119 Wis. 141, 96
N. W. 554.    We are constrained to conclude that there were
some phases of this case to which the rule discussed had such
material bearing that the erroneous statement of it, especially
in connection with the error hereafter mentioned, may well
have led to a different result than would otherwise have been
reached.

On the subject of whether the homicide was characterized
by the specific intent. to take human life essential to murder
in the first degree, distinguishing it from lower degrees, the
trial court instructed the jury in these words:

"In deciding whether the defendant is guilty of murder or
of manslaughter, you will bear in mind that the law presumes
that the person intended the consequences of his acts."

There is very little, if any, justification for giving such an
unguarded instruction as a warrant for finding the specific
intent to kill a human being essential to the highest degree of

criminal homicide. It is illogical and contrary to common. knowledge, as the language used might well be understood by a jury, and probably was in this case. The natural result of any one of many acts which might be suggested might be the death of a human being and not suggest, even remotely, a specific purpose formed before doing the act to thereby take human life.

Neither in civil nor criminal matters, is the law so uncharitable as to hold one presumptively accountable for having, precedent to his every act leading naturally, however remotely, to a particular result, mentally determined upon effecting such result, and perpetrated such act to that end. It is only where the result is the one which would be ordinarily expected to occur under ·the circumstances,—one so common that any person circumstanced like the actor would probably expect it to occur.

The rule which the trial court improperly stated, is most safely and commonly phrased as suggested in *Cupps v. State,* 120 Wis. 504, 515, 97 N. W. 210, 98 N. W. 546, this way:

"In the absence of evidence to the contrary, he who takes the life of another by the infliction of a wound or some act naturally and probably calculated to produce death, is presumed to have intended that result."

One of the most learned of our text-writers puts it this way: "Every person is presumed to contemplate the ordinary and natural consequences of his own acts." 3 Greenl. Ev. § 14.

Courts generally follow that phrasing substantially. *State v. Lautenschlager,* 22 Minn. 514; *State v. Brown,* 41 Minn. 319, 43 N. W. 69. In *Clifford v. State,* 58 Wis. 477, 17 N. W. 304, the court approved this statement of the rule: "A reasonable person intends all the natural, probable, and usual consequences of his acts," and this statement of it: "If a reasonable man uses a deadly weapon and life is taken, he is presumed to intend the natural consequences of his act and would

Beauregard v. State, 146 Wis. 280.

be guilty of murder,". was approved as applied to circumstances of the intentional use by one person of a deadly weapon on the body of another in a manner which would be ordinarily expected to cause death.

In a quite limited sense one is presumed to intend the natural result of his acts. So, as said by the learned text-writer to whom we have referred:

"When one man is found to have killed another, *if the circumstances of the homicide do not of themselves show that it was not intended,* but was accidental, it is presumed that the death of the deceased was designed by the slayer and the burden of proof is on him to show that it was otherwise."

Thus where the character of the act is known, which is the case commonly and was here, then the specific intent to effect the result of such act, in case of its being death, is not presumed unless such result was "the necessary," "probable," "usual," or "ordinary" result of such act. The several words. are used as alternatives and substantially as synonyms.

Applying the foregoing to this case the prejudicial character of the instruction is very apparent. While the gun barrel was, considering the manner of its use, a dangerous weapon, blows with one, as in this case, not delivered with sufficient force to fracture the skull, would not necessarily, or generally, cause death. Perhaps such a result would rather be exceptional than usual. So such result, looking to the circumstances alone, would not raise a presumption of specific intent to slay. The jury may well have based the verdict largely, if not wholly, on a different idea. There is a strong probability that they did, since there is very slight evidence, if any, of such specific intent.

In view of what has been said, the point made in the argument, based on exceptions in the record duly saved, that the verdict of murder in the first degree is contrary to the evidence, seems well taken.

The circumstances of the homicide seem to rather negative

than to establish a premeditated design to kill. True, if such a design was formed in the mind of the accused at any time, even though but an instant before or substantially when he struck the fatal blows, and they were delivered to effect it, that would be sufficient. But where is the evidence of such design? There was no ill will between the deceased and the accused, except such as was momentary, caused by the latter suddenly coming upon the scene of abuse by the deceased of Mrs. Mitchell. The evidence indicates that, immediately, the assault which resulted fatally occurred. The blows were struck, doubtless, in revenge, as the accused testified, more than self-defense. There was great provocation for an outburst of uncontrollable passion under the circumstances. That was far more natural than the instant formation of a design to commit murder. The blows were struck after the deceased was disarmed so accused could easily have made his self-defense without resorting to any very extreme measures. They were delivered in rapid succession, as we have seen, and not hard enough to ordinarily have caused death. There was no attempt to follow them up so as to indicate that the accused had murder in his heart. He did not act as if conscious of having taken Mitchell's life till informed of the result of the assault, and then did not act as if he had intended such result. On the whole, the trial court might well have declined to submit murder in the first degree to the jury. It is quite plain that the motion to set aside the verdict because the evidence did not warrant a finding of designed homicide should have been granted.

The complaint that the court neglected to define "heat of passion" is answered, sufficiently to preclude condemnation of the result of the trial for failure to do so, because no request was made on the subject. True, the jury might well have been judicially advised in respect to the matter. True, had they been so advised the result might have been different. True, also, good administration in such a case calls for such

advice. The mere reading of the statute to a jury in such circumstances as existed in this case would very inefficiently prepare them to justly determine the controversy. However, the accused was competent to waive the giving of instructions on any material point and must be held to have done so as to the matter in question, since no suggestion as to instructions on the subject was made.

The result of the foregoing is that the judgment must be reversed and cause remanded for a new trial.

*By the Court.*—So ordered, and that the warden of the state prison deliver the accused into the custody of the sheriff of Bayfield county to be by him held until he shall be discharged or his custody changed by due course of law.