JANDRT, Plaintiff in error, v. STATE, Defendant in error.

*Nos. State 156, 157. Argued June 6, 1969.—Decided June 27, 1969.*
(Also reported in 168 N. W. 2d 602.)

For the plaintiff in error there were briefs and oral argument by *James H. McDermott,* state public defender.

For the defendant in error the cause was argued by *Theodore J. Hodan,* assistant district attorney of Milwaukee county, with whom on the brief were *Robert W. Warren,* attorney general, *William A. Platz,* assistant attorney general, and *E. Michael McCann,* district attorney.

WILKIE, J. On this review the principal contention of the defendant is that the evidence is insufficient to sustain a finding of guilt beyond a reasonable doubt. Specifically, the public defender contends that the uncorroborated testimony of an accomplice, Gerald Mapps, who said he observed the defendant pry open the panel of a door of the burgled premises with his hands, is not entitled to belief and will not support the finding of guilt.

In *Sparkman v. State,*[1] this court reiterated the oft stated rule:

". . . The uncorroborated testimony of an accomplice is . . . competent evidence upon which to base a verdict of guilty *if it is of such a nature that it is entitled to belief* and the jury believes it." (Emphasis added.)[2]

---

[1] (1965), 27 Wis. 2d 92, 133 N. W. 2d 776, and cases cited therein.

[2] *Id.* at page 95.

Our first inquiry must be to ascertain the precise testimony of the accomplice as to how defendant gained entry to the burgled premises.

Admittedly, the only person claiming to have been an eyewitness to the burglary for which the defendant was convicted was the accomplice, Gerald Mapps. Mapps was sixteen years of age at the time of the trial. The prosecution stipulated that Mapps was an inmate at the juvenile detention center at Plymouth "by reason, among other things, [of the fact that] he was involved in this incident, for whatever merit it has."

According to Mapps, he and the defendant had on November 6, 1966, at 7 p. m., gone together to the R. B. Tool & Manufacturing Company after he and the defendant had conversed about the defendant's need for money. Mapps testified that after they arrived at the premises, "we broke into it." On direct examination he stated that "we got a door pried open" and further testified that the defendant entered the building first, by going through the door that was pried open. Mapps stated that he entered the building when the defendant "opened the side door for me." Defense counsel concedes that up to this point Mapps' narrative might be plausible but contends that on cross-examination it was rendered incredible.

The transcript reads as follows:

"*Q.* When you got to this door, as I believe you testified, that was pried open—*A.* Yes?

"*Q.*—do you recall what that door looked like? *A.* Like a *big sheet of plywood.*

"*Q.* Now, would you explain to the jury how this sheet of plywood, as you explained it, was pried open? *A. Jerry Jandrt pried it open with his hands* and I held it for him while he crawled through.

"*Q.* Just a minute. *With respect to the actual prying, he pried this open with his hands? A. Yes, sir.*

"*Q. Did you see him do this? A. Yes, sir.*

"*Q. With his hands? A. That's right.*

"*Q.* Did he pry it from the top? *A.* No, sir.

"*Q.* From the bottom? *A.* Yes, sir.

"*Q.* And how did this piece of plywood, or this door, come out, if you recall, as he was prying it? *A. Well, the bottom corner just pulled open,* or, you know, about like I said, about a couple of feet. Just enough so I could hold it and he could crawl through.

"*Q. And he used nothing but his hands? A. That's right.*" (Emphasis added.)

The public defender contends that the above-quoted testimony is of cardinal importance and if it is unworthy of belief then the uncorroborated testimony of Mapps was not such as to provide adequate support for the guilty verdict. Defense counsel argues that the record in this case establishes that the feat of prying open the panel attributed by Mapps to the defendant was well beyond the defendant's physical strength, and one which a much larger and stronger man might have found exceedingly difficult, if not impossible.

Concerning the door panel, Mr. Robert Bluma, owner of the R. B. Tool & Manufacturing Comany, testified as follows:

"*A.* I can tell you this would be four feet pieces, 3 x 8, because this is the way plywood comes. . . .
"
". . .
"*Q.* Four foot panel, the one that was pried? *A. The one pried loose here, yes.*
"*Q.* You are referring now to the, as you look at it, the right hand side lower corner? *A.* Yes.
"*Q.* Now, the construction of this panel, Mr. Bluma, was actually made up of three panels; is that correct? *A.* Yes.
"*Q.* And each panel contained some lumber and plywood? *A.* Yes.
"*Q.* Now, as you would look at this particular door with panels, would you be looking at plywood in that door panel? *A.* From the outside this is a 1 x 5 or 1 x 6 frame. Each of these is the frame, bolted together.
"*Q.* So each one of these panels is a 1 x 6 frame, bolted together, and has plywood. *A.* On the inside.
"*Q.* From the inside. Now, you indicated on this drawing, Mr. Bluma, some lines extending—*A.* Screws to the jamb there.
"*Q.* Screws to the jamb? *A.* Yes.

"*Q.* So that the sides of this door, as you looked at it, the side of the door, as you look at it, were screwed into the jamb. *A.* Yes.

"*Q.* Is that what that black line through the side indicates? *A.* Yes.

"*Q.* Now then, also you show some curved or jagged lines. *A.* These are hooks on the inside, in the event— because someone might go to the trouble of removing the screws. Well, they're there with hooks on the inside in addition to that.

"*Q.* So that hooks were on the inside of this panel, which was on the inside of the west wall of your building. *A.* Right.

"*Q.* And these hooks were such that they would hook into an eye; is that correct? *A.* Yes.

"*Q.* And in addition to that the panel was screwed into the side plate of the door jamb, or whatever you want to call that. *A.* Yes.

"*Q.* And this plywood was on the inside of the building? *A.* Yes.

"*Q.* So that if this plywood were to be pulled outward, it would have to be pulled against these screws and against these—*A.* Yes.

"*Q.*—hooks. *A.* That's right.

"*Q.* Did this door provide good protection against the elements? *A.* Yes, adequate.

"*Q.* So that it was tight fitting; is that correct? *A.* Yes." (Emphasis added.)

The public defender contends that this quoted testimony raises a reasonable doubt that the door panel in question could have been pried open by the defendant with his bare hands. It is argued that even a man of extraordinary strength could not have accomplished the act of prying open the door panel without the aid of some tool or instrument. According to defendant's own testimony, in addition to his light weight of 132 pounds, he had never done any extensive type of athletic work.

After reviewing the entire record we are satisfied that the accomplice's testimony, even if limited to his observation that the defendant pried the door panel open with his bare hands, is not incredible and that the jury could have believed what the accomplice said he observed.

Furthermore, the state correctly points out that it was dark outside when the defendant was attempting to gain entry to the burgled premises and that Mapps' testimony indicated that Mapps was acting as a lookout for possible cars. Thus, the state correctly concludes Mapps was unable to see all the defendant's actions and Mapps "may well have not observed the defendant using some instrument to assist in loosening the plywood panel."

In other words, Mapps admitted to a limited interval of time during which the defendant may have used a tool to help pry open the door panel. In any event when the door panel was finally pried open, Mapps said he saw the defendant doing this with his own hands. We find this believable.

The state also urges that Mapps' testimony was corroborated. In *Sparkman* we said:

". . . testimony of an accomplice which is corroborated by physical facts or other testimony is sufficient to sustain a conviction. *State v. Ketchum* (1952), 263 Wis. 82, 56 N. W. 2d 531; Anno. 96 A. L. R. 2d 1185, Witness-Accomplice-Corroboration. Here, the corroborating testimony of other witnesses and the physical evidence confirmed material parts of the accomplice's testimony and also connected the defendant with the commission of the crime." [3]

We find that there is a good deal of testimony that connects the defendant with the commission of the crime.

The defendant himself admitted being with Mapps on the night of the burglary and further admitted receiving some Camel cigarettes from Mapps. Some of this brand of cigarettes were taken from the burgled premises. This testimony certainly is circumstantial evidence from which the jury could conclude that Mapps and the defendant were together during the earlier part of the evening when the burglary took place.

[3] *Supra,* footnote 1, at pages 95, 96.

Additionally, the defendant admitted that he observed Mapps with the burgled checkbook and saw him place it in an abandoned automobile. Again, from this circumstantial evidence, the jury could well have concluded that defendant was tied to the entry of the premises from which the checkbook was taken.

It may be that there was no detailed corroboration of the precise testimony of the prying open of the door. To require this would place an impossible burden on the state. It seemingly would have to produce another eyewitness. This is not required. In our opinion, the participation of the defendant in the commission of the crime could be amply inferred from defendant's own testimony and this was sufficient corroboration for the implicating testimony of the accomplice.

The second major issue presented in this review is whether defendant's right to due process was violated in that the closing arguments of trial counsel were not recorded verbatim.

At the outset it must be noted that there was no request by defendant or his trial counsel to have closing arguments recorded, nor was there any objection in the trial court or is there here to any part of the state's closing argument.

In *Price v. State*,[4] this court observed that:

"Defendant urges this court to grant a new trial because certain allegedly prejudicial statements were made by the prosecution during closing argument. Without reaching the merits of this question, the argument must be rejected because it is clear that trial counsel did not object at any time to the statements of the prosecutor, nor did he move for a mistrial during or at the close of the argument. In *State v. Christopherson* (1967), 36 Wis. 2d 574, 153 N. W. 2d 631 (October 31, 1967), defendant made a similar argument. The court summarily rejected the contention: . . . ."[5]

---

[4] (1967), 37 Wis. 2d 117, 154 N. W. 2d 222.

[5] *Id.* at pages 134, 135. *See State v. Christopherson* (1967), 36 Wis. 2d 574, 153 N. W. 2d 631.

It is clear that defendant cannot prevail on this issue.

Recognizing the basic fairness of recording opening or closing arguments, on request, the court adopted sec. 256.55, Stats., effective January 1, 1968 (after the trial herein). That rule provides in part in sub. (3) as follows:

"(3) Voir dire examinations in any civil or criminal action need not be reported unless ordered by the court. Opening statements and closing arguments shall be reported in any action upon request of a party or upon order of the court. A request to report opening or closing argument shall be made on the record before any such argument has commenced."

The third issue raised by the defense is that a new trial is warranted in the interest of justice for the reason that trial counsel herein failed to subpoena or call key alibi witnesses to testify in defendant's behalf, and that trial counsel failed to give notice of alibi as required by sec. 955.07, Stats.

A portion of the transcript reads as follows:

"*A.* . . . When I left home [on the evening of November 6, 1966] I come up to the Raceway, and it was just shortly after dark, not too long after dark. And I was home alone with my mother at the time, and I waited until another brother came home before I left. So she told me it wasn't until after 8:00 o'clock that I had left. So I don't know, but anyway, I come up to the Raceway, it was little bit after dark.

"*Q.* And you stayed there until you left? About 8:00 or 9:00 o'clock? *A.* No, I arrived there, and I stuck around there with somebody else. I was in somebody else's company, in fact Jerry Mapps was there when I arrived there. He was in the company of somebody else. He was talking, or—."

The public defender argues that this testimony clearly shows that it was vital to the defendant's defense in this case that his mother, brother, or someone else be called as a witness to establish that defendant was not with Mapps at the time of the burglary. However, this argu-

ment begs a series of questions which cannot be answered from the record. It is not known whether these witnesses were available; whether they would in fact have corroborated defendant's testimony. To conclude that certain witnesses did not testify because of counsel's incompetence appears to be mere speculation. It could just as well have been due to counsel's deliberate strategy.

We are satisfied that defendant was not denied effective assistance of counsel.[6]

Defendant's final contention is that the verdict of guilty was contrary to law and to the evidence in that the defendant was charged, among other things, with removing $16 in cash from the premises and was found guilty of burglary as charged; *but* there was no testimony or proof to the effect that defendant or any other person removed money from the premises in question.

Counsel notes that the trial court read the information to the jury as part of the instructions. Therefore, counsel concludes that when the jury returned its verdict of guilty it was finding the defendant guilty of all things charged in the information. Yet, counsel concludes, and correctly, that there was *no* evidence of the removal of any cash from the premises.

But the state notes that theft is not an element of the crime of burglary,[7] and that the trial court instructed the jury on the elements of burglary.

It is unfortunate that the state failed to remove this language from the information if it did not plan to introduce substantiating evidence, but it could hardly be called prejudicial error.

*By the Court.*—Judgment and order affirmed.

---

[6] *See State v. Cathey* (1966), 32 Wis. 2d 79, 145 N. W. 2d 100.
[7] *Cullen v. State* (1965), 26 Wis. 2d 652, 663, 133 N. W. 2d 284.