STATE, Respondent, v. WELLS, Appellant.*

*No. State 107. Argued May 7, 1971.—Decided June 7, 1971.*
(Also reported in 187 N. W. 2d 328.)

* Motion for rehearing denied, without costs, on September 8, 1971.

478

480

For the appellant there were briefs by *Joseph C. Niebler*, attorney, and *Whyte, Hirschboeck, Minahan, Harding & Harland* of counsel, all of Milwaukee, and oral argument by *Mr. Niebler*.

For the respondent the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief were *Robert W. Warren*, attorney general, *William A. Platz*, assistant attorney general, and *E. Michael McCann*, district attorney of Milwaukee county.

ROBERT W. HANSEN, J. The record in this case sets forth the standard operating procedures that mark the mugging-type robbery.

*There is the selection of the victim.* Senior citizens, particularly those living alone and suffering the infirmities of advancing years, are preferred targets. Here the victim, Frederick Gens, was an eighty-one-year-old man, living alone in a rented room.

*There is the selection of the time and place.* By advance surveillance or "stakeout," a time and place are selected when it is predictable that the victim will be

alone. Here the time of the assault was 9:30 a. m., on a Sunday morning; the place, the porch of the rooming house where the victim lived.

*There is the use of an accomplice as decoy and lookout.* The role of the accomplice is to engage the attention and disarm the suspicions of the selected victim, as well as to serve as lookout for the police or other unwelcome intruders. Here a woman associate was used to persuade the victim to step out onto his porch, and to keep watch. She fled, however, soon after beating commenced.

*There is the selection of the weapon to be used.* The function of the weapon in a mugging is to make it unlikely that the victim will have time to shout for help or have any chance to make any resistance. Thus, a gun, if selected, is as likely to be wielded as a club against the skull as it is to be pointed at the victim. Here the weapon chosen was a family-sized soda water bottle.

*There is an immediate resort to violence.* Typically, the mugger, without warning, jumps on the victim and commences beating him into a state of helplessness. Unlike the professional bank robber, the mugger hits first, asks questions afterwards. Here the defendant leaped at the victim, beat him about the head, knocked him down, beat him some more, and took his wallet (containing $16 in currency).

*There is a savagery to the beatings administered.* The brutal beatings that characterize most muggings go beyond the purpose of securing silence or preventing resistance. The degree and type of violence used goes far beyond the jostling of the targeted victim by a pickpocket or purse snatcher. Here the defendant, after he had clubbed the eighty-one-year-old victim to the floor of the porch, jumped on him as he lay prone, and continued or renewed beating him about the head.

*There is the trip to the hospital for the victim.* Unless beaten to death on the scene, the mugging victim usually requires hospital treatment because of the brutal beating he suffered. Here the victim was admitted to the county emergency hospital shortly after 10 a. m. where it was ascertained that he had been beaten extensively about the head and chest, suffering, among other injuries, four deep scalp lacerations and a fractured skull. It is stipulated that he died of the skull fracture and cerebral damage.

Given a record establishing the death of a victim of a mugging-type robbery, postconviction counsel argues that only third-degree murder—murder while engaged in the commission of a felony (sec. 940.03, Stats.)—was established, not first-degree murder—causing the death of another human being with intent to kill that person (sec. 940.01). Counsel argues that the defendant may have intended to beat up Mr. Gens and take his money, but did not intend to take his life. In other words, the defendant may have intended to take his victim to the threshold, but did not intend to push him over it. The contention is that the defendant must be held to have intended only to take his victim up to the doorstep of death, even though he turned out to be a poor judge of distance.

Seldom is an intent to kill ascertainable from the lips of the intender. Never can it be established by a retroactive mind-reading effort to determine what the actor was thinking when he planned and executed the act. That would require a crystal ball that re-created the past rather than sought to peer into the future. So as an objective test to determine the subjective intent of the doer of a deed, the courts rely upon a presumption, well stated by this court to be:

"In the absence of evidence to the contrary, he who takes the life of another by the infliction of a wound naturally and probably calculated to produce death is presumed to have intended that result and to be guilty of murder in the first degree under our statutes. . . ." *Farino v. State* (1931), 203 Wis. 374, 380, 234 N. W. 366. *See also: Gelhaar v. State* (1969), 41 Wis. 2d 230, 163 N. W. 2d 609; *Greer v. State* (1968), 40 Wis. 2d 72, 161 N. W. 2d 255.

Evidence of contrary intention may rebut the presumption. *See: Melli v. State* (1936), 220 Wis. 419, 265 N. W. 79; *Gelhaar v. State, supra, Greer v. State, supra; Beauregard v. State* (1911), 146 Wis. 280, 131 N. W. 347.

It is this test of presumptive intent that the trial court correctly followed in finding the defendant to have intended the death of the victim, the court finding:

". . . there is an intent to kill a human being, manifested by the actions of the defendant, and he is bound by the usual and ordinary and probable results of his free and deliberate acts. If there are no circumstances to rebut the presumption, the law presumes that death was intended, if a person uses such means as would cause death, unless there are circumstances to prevent or rebut the presumption, which, in this case, do not exist."

Postconviction counsel concedes that this court has repeatedly approved the application of the test of presumptive intent in murder and attempted murder cases, but points out these were cases involving guns or knives, noting that, ". . . In all of these cases the weapon used was intrinsically lethal—a gun or knife—and the facts surrounding the use of the weapon indicated death was intended. . . ." The lethal or death-dealing aspect of a particular weapon derives from the manner and circumstances surrounding its use as much as from its physical properties. When a blackjack or large bottle is swung repeatedly against the skull of a defenseless

person, death is as predictable a consequence as when there is involved the thrust of a steak knife. It is the circumstances surrounding the use of the weapon which must be considered in each case.

As to the facts and circumstances in this case, defendant's brief states, in part: "Taking the evidence most favorably to the State," as it is to be taken on a challenge to a conviction, "it indicates that the defendant struck Mr. Gens two or three times with an empty 10-ounce soda water bottle; that the blows were not administered with sufficient force to knock Mr. Gens unconscious . . . ." That understates the case. While the record does not disclose the precise number of blows struck, the hospital findings establish that at least four of the blows were of sufficient force to lacerate the defendant's scalp deeply. It is stipulated that the cause of death was a fractured skull, so one of the blows was of sufficient strength to be skull-fracturing. One eyewitness described the noise of the blows like that of children jumping up and down on the hood of an automobile. Another eyewitness heard a sound like breaking bottles or hitting on walls, and heard someone groan, "don't, don't." Coming up from his position under his auto, he saw defendant strike the old man, who was then standing, a couple of times on his head, knocking him down, and then strike him two or three more times after he lay prone. The ferocity of the blows was such as to prompt the witness to tell the defendant not to beat the old man to death. Such testimony is not only indicative of the severity, as well as repetition of blows, but gives a two-phase aspect to the sequence of events. The first sequence of blows was struck while the victim was standing. The second series of blows, whether viewed as a continuance or renewal of attack, was delivered when the victim had been knocked down and lay helpless on his stomach on the floor. As to the second, it cannot be contended that the blows were intended or required to

remove the possibility of spirited resistance by the eighty-one-year-old victim, by then knocked prone, rendered helpless and pleading only, "don't, don't." The defendant did not stop beating the old man until he became aware that he was being observed by a bystander who was approaching, hammer in hand.

Defendant's counsel on appeal argues that the presumptive intent never arose in this case, or, if it did, it was rebutted by the circumstances surrounding the crime. We agree with the trial court finding that presumptive intent to kill was established, and not rebutted. However, while not quoted nor challenged by defense counsel, the trial court interpolated in making his findings: ". . . So, if he wants to take a chance and use a Fanta soda water bottle on the skull of that defenseless old man and that man dies therefrom, that is murder in the 1st degree, *under all the evidence*. . . ." (Emphasis supplied.) Without the last four words, the statement might suggest that a single swipe with an empty bottle at the head of an older person creates a presumption of intent to kill, which would be neither good law nor good common sense. With the qualification, "under all the evidence," the reference is to "all the evidence" in this record in this case against this defendant. That evidence supports a finding that the defendant repeatedly bludgeoned an aged man about the head—continuing or renewing the bludgeoning after the victim had been knocked down—inflicting, among other injuries, four deep scalp lacerations and a skull fracture, the stipulated cause of death. That evidence clearly sustains the finding of presumptive intent to kill, not rebutted by the circumstances here.

Several other points raised on this appeal require less extended discussion for their disposition.

Two eyewitnesses, John Eiland and Lee Pharm, testified for the state. The trial court found that the identification of the defendant by these eyewitnesses ". . .

was based upon their actual observation of the defendant prior to the time of the assault and their seeing him at the time of the fatal assault and robbery." There is credible evidence to support this trial court finding. Defendant's counsel stresses their distance from the assault (100 feet and 30 feet) and ". . . their preoccupation with other matters at that time. . . ." Neither point is well taken. People are not callous or the sight of an old man being beaten to death so common that the spectacle is unlikely to command the undivided attention of persons standing 30 or 100 feet away. There was in this case a photo-identification of the defendant from police picture files made by one of the eyewitnesses. No objection is raised to it on this appeal. There was also an identification of the defendant by both eyewitnesses of the defendant from a group of 15 to 20 persons of all sizes, shapes and colors crowded into the district attorney's office. No objection was made as to such pretrial identification at the time of trial by trial counsel. It does not remain as a stone for the sling of postconviction counsel. (*See: State v. Cole* (1971), 50 Wis. 2d 449, 453, 454, 184 N. W. 2d 75.)

The defendant's accomplice, Miss Kristy Ruhe, waived her privilege against self-incrimination and testified for the state. On cross-examination she firmly testified that no promises were made to her in connection with her testimony. Defendant's post-trial counsel asks that her testimony be found to be "patently incredible" because of inconsistencies in her recollection of events of the day preceding the murder. There was no confusion shown by her in her testimony that the defendant with her assistance robbed and assaulted the murder victim, and that was the most material portion of her testimony. Credibility was for the trial court to determine (*Gauthier v. State* (1965), 28 Wis. 2d 412, 137 N. W. 2d 101, certiorari denied, 383 U. S. 916, 86 Sup. Ct. 910, 15 L. Ed. 2d 671) and the trier of fact was entitled to accept the

portions of her testimony that it found credible. (*Embry v. State* (1970), 46 Wis. 2d 151, 174 N. W. 2d 521.) The suggestion that an accomplice's testimony is, by that status alone, rendered incredible is rejected. In this state, even the uncorroborated testimony of an accomplice is competent evidence upon which to base a verdict of guilty. (*Jandrt v. State* (1969), 43 Wis. 2d 497, 168 N. W. 2d 602.) Here it was certainly corroborated. Additionally, defense counsel contends that the failure of the state to have disposed of the charges against the accomplice before defendant was tried renders her testimony "inherently untrustworthy and unreliable." "Viable alternatives" to the procedure followed are suggested by defendant's brief to be either ". . . trying her first or granting immunity to her . . . ." Either of these alternative procedures could have been used, but the state was not required to do other than it did do here. Where charges against an alleged accomplice or codefendant have not been disposed of, such accomplice or codefendant is competent to testify against the defendant, the weight to be given such testimony being in the area of credibility, not admissibility. (*See:* 3 Wharton, *Criminal Evidence* (12th ed.), p. 81, sec. 753; and 23 C. J. S., *Criminal Law,* p. 65, sec. 804 (3) (a)).

After finding the defendant guilty of murder in the first degree, the trial court sentenced him to an indeterminate prison term of not more than thirty years for armed robbery and a consecutive life term for first-degree murder. Defendant's counsel on appeal challenges the imposition of consecutive sentences, noting that "Under the mandatory life sentence for first-degree murder, the defendant is not eligible for conditional parole for at least 11 years, 3 months. . . ." so that "[t]he effect of making the armed robbery sentence consecutive is to add one more year of mandatory imprisonment to his total sentence . . . ." To the frequently expressed strong aversion to interfering with the trial

court's area of discretion as to sentencing (*McCleary v. State* (1971), 49 Wis. 2d 263, 182 N. W. 2d 512; *Riley v. State* (1970), 47 Wis. 2d 801, 177 N. W. 2d 838), there must be added here complete endorsement of the trial court's comments on the viciousness of the crime and the defendant's willingness to take a human life to obtain money. The imposition of consecutive sentences was done for good reason, clearly stated. The defendant loses one additional year. His victim lost more than that.

*By the Court.*—Judgments and order affirmed.

HEFFERNAN, J. (*dissenting*). Normally, to prove a felony, the prosecution must establish two elements, referred to at common law as *actus reus* and *mens rea*—a guilty act and a guilty mind. Perkins, *A Rationale of Mens Rea,* 52 Harvard Law Review (1939), 905. While the evidence in the instant case could have been sufficient to establish both the act and the mental element of the crime of first-degree murder, the trial court's finding that the defendant's act was accompanied by the requisite intent was based on an erroneous view of the law.

Before rendering a verdict of guilty on the charge of first-degree murder, the finder of fact must be convinced beyond a reasonable doubt that the defendant caused the death of another human being "with intent to kill that person or another." Sec. 940.01 (1), Stats. To constitute this crime, the act which causes death must be accompanied by a specific intent, the "intent to kill." This mental element is defined as "the mental purpose to take the life of another human being." Sec. 940.01 (2). It must be distinguished from so-called "general intent," which requires only that the prohibited act be voluntarily committed and that the actor have the capacity to understand that his act is wrong. Remington and Helstad, *The Mental Element in Crime—A Legislative Problem,* 1952 Wisconsin Law Review 644, 664. Where specific intent is required, proof of malice or mere general intent

is insufficient. *Hydrick v. State* (1963), 246 Miss. 448, 150 So. 2d 423. The specific intent is as much an element of the crime as the act itself, and the act without that specific intent does not constitute the crime. *Markiton v. State* (1957), 236 Ind. 232, 139 N. E. 2d 440; *State v. Thomas* (1910), 127 La. 576, 53 So. 868; 22 C. J. S., *Criminal Law,* pp. 115, 116, sec. 32; 21 Am. Jur. 2d, *Criminal Law,* p. 164, sec. 82.

However, because the fact finder cannot probe the mind of the defendant, the existence of the requisite specific intent must be inferred from the circumstances surrounding the act. This court has often said that a person is presumed to intend the natural and probable consequences of his acts. *Gelhaar v. State* (1969), 41 Wis. 2d 230, 163 N. W. 2d 609. Intent to kill may be presumed where death was " 'the necessary,' 'probable,' 'usual,' or 'ordinary' result of such act." *Beauregard v. State* (1911), 146 Wis. 280, 289, 131 N. W. 347.

The trial judge in the instant case prefaced the announcement of the verdict with the correct statement that a person is presumed to intend the "usual and ordinary and probable" consequences of his acts, but then he went on to say:

"The settled law is that one takes one's victim as he finds him. So if he wants to take a chance and use a Fanta soda water bottle on the skull of that defenseless old man and that man dies therefrom, that is murder in the 1st degree, *under all the evidence,* and I arrive at that conclusion without any doubt at all." (Emphasis supplied.)

Were this a correct statement of the law, every act voluntarily committed by a person with the capacity to understand that the act was wrong which resulted in the death of another human being would be first-degree murder. There would be no need for second-degree murder (sec. 940.02, Stats.), third-degree murder (sec. 940.03), manslaughter (sec. 940.05), or any of the other

types of homicide from which first-degree murder can be distinguished only by its requirement that the actor have the mental purpose to take the life of another human being. Such a view of the law is inconsistent with the statutory classification scheme for homicides and could not have been intended by the legislature. To commit first-degree murder, the accused must have the specific mental purpose of taking the life of another. If he is only "taking a chance" on striking his victim on the head and death results, his act, however reprehensible, is not first-degree murder.

The majority glosses over the trial court's erroneous view of the law by focusing on the trial judge's use of the words, "under all the evidence," in connection with his misstatement of the law. The majority apparently infers from the addition of these words that the trial judge, rather than relying on his erroneous statement of the law, was indicating that the evidence convinced him that the defendant had the requisite mental purpose to take the life of Frederick Gens. In my opinion, such an inference cannot reasonably be drawn from those words. Furthermore, the majority opinion overlooks the trial judge's subsequent statement, made during hearing on motions after verdict. The judge said:

"I characterized this as a type of crime—it was very vicious, a premeditated crime, and I made the observation [upon announcing the verdict] and I do it now that the defendant takes the victim as he finds him and if the victim is an older man and more vulnerable for that kind of injury than a younger man with a thicker skull, that is purely the defendant's hard luck. He is the one that administered the blows and he is responsible for them."

This statement makes it abundantly clear that the defendant was found guilty of first-degree murder, not because the trial court found that he had the mental purpose to take his victim's life, but only because he

intentionally unleashed the blows and those blows resulted in the death of the victim.

First-degree murder is the most serious offense defined by our legislature. It carries the mandatory sentence of life imprisonment. The consequences of the fact-finder's decision and the affirmance by this court are very grave, not because of a sentence imposed on a criminal who merits little sympathy but because the affirmation of the trial court's rationale permits a misapplication of a clear legislative expression. The fundamental error in this case cannot be ignored.

A legal error made by an able but overworked judge who must decide during the heat of trial is excusable, but an appellate court, having the time to deliberate and to decide with correctness cannot gloss over what I consider to be a clear error of law.

When the state seeks a sentence of lifetime incarceration, the duty of this court is to see that the prosecution and the trial court conform to legal standards. Where a trial judge invokes erroneous legal standards in determining guilt, and it cannot be said as a matter of law that the application of such standards did not affect his determination, the judgment must be reversed. It is not harmless error.

I would reverse and remand the case to the trial court for a determination of whether under the evidence presented at trial and under proper legal standards the defendant had the mental purpose to take the life of his victim at the time of the assault.

I am authorized to state that Mr. Chief Justice HALLOWS and Mr. Justice WILKIE join in this dissent.