WILLIS, Plaintiff in error, v. STATE, Defendant in error.

*No. State 66. Submitted under sec. (Rule) 251.54 June 7, 1973.—*
*Decided June 29, 1973.*
(Also reported in 208 N. W. 2d 403.)

160

For the plaintiff in error the cause was submitted on the brief of *Morton Gollin* of Milwaukee.

For the defendant in error the cause was submitted on the brief of *Robert W. Warren,* attorney general, and *Michael R. Klos,* assistant attorney general.

ROBERT W. HANSEN, J. The principal contention of the defendant is that the evidence adduced at trial was insufficient to support the jury verdict of guilty on the charge of attempted aggravated battery. The test on appeal of the sufficiency of the evidence to convict is whether the "evidence adduced, entitled to belief, and rationally considered by a jury was sufficient to prove the defendant's guilt beyond a reasonable doubt." [1] The test is "not whether this court is convinced of the defendant's guilt but whether the jury acting reasonably could be so convinced." [2] Stating the rule conversely for the sake of clarity, the evidence " 'when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude which the law defines as "beyond a reasonable doubt." ' " [3] It is, therefore, the evidence that supports the jury verdict, and inferences reasonably drawn therefrom, that are to be reviewed on the issue raised by the defendant.

[1] *State v. Shaw* (1973), 58 Wis. 2d 25, 28, 205 N. W. 2d 132 (and cases cited).

[2] *Id.* at page 29.

[3] *Zebrowski v. State* (1971), 50 Wis. 2d 715, 723, 185 N. W. 2d 545, quoting *Lock v. State* (1966), 31 Wis. 2d 110, 114, 115, 142 N. W. 2d 183.

*Identification of defendant.*

There is ample evidence in this record establishing the positive identification by the complaining witness of the defendant as being one of the three men who assaulted him. The victim of the assault had ample opportunity to observe the three who attacked him. He observed the three assailants as they first walked away with the woman who had stone in hand. He observed the three when they came back and walked up to him with one asking, "What happened?" He observed them during the assault or beating. He recognized the three of them, defendant included, when he saw them in the restaurant. He recognized two of the three, the defendant one of the two, when the squad car drove by them on May 13th. He testified that the lighting in the vicinity of the apartment and assault was adequate, with a 50-watt bulb eight feet away and street lights one-half block away, plus light on the street from a tavern across from the apartment. While he testified that he "never saw them before," apparently referring to seeing them before the night of the assault, he had several opportunities to observe them on the night he was attacked, and he was positive in his identification of the defendant as one of the three assailants.

*Interruption of assault.*

Defendant would have us view the assault as a completed act of battery from which the three assailants walked away, rather than as an assault interrupted by the appearance of two ladies on an upstairs porch and shouts from them or someone else. Asked why the men stopped the beating and kicking, the complaining witness answered that a lady tenant, living in an upstairs apartment, and her aunt came out on the porch. He further testified that he heard somebody shout but that he could not tell, as he was being kicked and beaten, exactly where the shouts came from. It is an entirely

reasonable inference from this testimony that the tenant lady and her aunt did the shouting. Even if the shouts came from someone or somewhere else, it is an equally reasonable inference that the ladies appearing on the upstairs porch and the shouting, either or both, led the three assailants to stop their kicking and beating and leave the scene. The evidence as to the assault being interrupted is circumstantial, but this court has said that circumstantial evidence "can be as forceful as eyewitness testimony and can form a rational basis for conviction." [4]

*Intent to do great bodily harm.*

Defendant's brief contends that the state failed "to prove that this defendant had the intent to commit the crime of aggravated battery." The intent required for conviction of the crime of aggravated battery [5] or the crime of attempted aggravated battery [6] is the "intent to cause great bodily harm." The crime of aggravated battery contains "three elements: The intention to cause great bodily harm, the causation by some act, and the

---

[4] *Zebrowski v. State, supra,* at page 722, citing *State v. Davidson* (1969), 44 Wis. 2d 177, 199, 170 N. W. 2d 755.

[5] Sec. 940.22, Stats., provides: "**Aggravated Battery.** Whoever intentionally causes great bodily harm to another by an act done with intent to cause bodily harm to that person or another may be fined not more than $2,500 or imprisoned not more than 5 years or both."

[6] Sec. 939.32, Stats., provides: "**Attempt.** (1) Whoever attempts to commit a felony . . . may be fined or imprisoned or both not to exceed one-half the maximum penalty for the completed crime; . . .

"(2) An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some extraneous factor."

degree of harm suffered by someone other than the actor." [7] Where, as here, the conviction is for attempted aggravated battery, the intent requirement is that "the defendant must have the intent to cause bodily harm which would have become great bodily harm if his actions had not been interrupted by the intervention of another person or some other extraneous factor." [8] Such intent can be proved by circumstantial evidence. Indeed, circumstantial evidence is "generally the only way intent can be proved." [9]

As an objective test to determine such subjective intent on the part of a doer of a deed, the courts rely upon a presumption. It is that "an accused is presumed to intend the natural and probable consequences of his acts, voluntarily and knowingly performed." [10] A person need not "foresee or intend the specific consequences of his act in order to possess the requisite criminal intent." [11] This presumptive intent "must be evidenced by inferences from the words and conduct of the actor and the circumstances surrounding the act." [12] So it is to the conduct of the defendant, and circumstances surrounding the assault to which we must direct our atten-

[7] State v. Gould (1973), 56 Wis. 2d 808, 810, 202 N. W. 2d 903.

[8] Dunn v. State (1972), 55 Wis. 2d 192, 197, 197 N. W. 2d 749.

[9] State v. Gould, supra, at page 812. See also: State v. Wells (1971), 51 Wis. 2d 477, 483, 187 N. W. 2d 328, stating: "Seldom is an intent to kill ascertainable from the lips of the intender. Never can it be established by a retroactive mind-reading effort to determine what the actor was thinking when he planned and executed the act. That would require a crystal ball that re-created the past rather than sought to peer into the future."

[10] State v. Schenk (1972), 53 Wis. 2d 327, 332, 193 N. W. 2d 26, cited with approval in State v. Gould, supra, at pages 813, 814.

[11] State v. Gould, supra, at page 813.

[12] State v. Schenk, supra, at page 332.

tion to determine if "intent to cause great bodily harm" is inferrable, as we would do to determine if "intent to kill" was established in a murder or attempted murder case.[13]

In determining whether it is a reasonable inference from the facts and circumstances of this case that the defendant (1) had an intent to cause great bodily harm; and (2) committed a battery which, except for the intervention of an extraneous factor or interruption, would have resulted in great bodily harm to another human being, it is a murder case that aids in the listing of facts and circumstances relevant to the presumption of intent.[14] In fact, the circumstances that, in the murder case, were sufficient to establish the required intent to kill are remarkably similar to those present in the record before us. They will be listed, and the two cases compared, circumstance by circumstance.

*Time and place.* In the murder case, the time was 9:30 a. m. on a Sunday morning; the place, the porch of the rooming house where the victim lived. In the case before us, the time was 1 a. m.; the place, the front of the building in which the victim lived in a basement apartment. In both cases, the time and place selected by the assailants was one "when it is predictable that the victim will be alone." [15]

*Age of victim.* In the murder case, the victim was an eighty-one-year-old man, living alone. In the case before us, the victim of the assault was a sixty-nine-year-old man, staying at a basement apartment. In both cases,

[13] *State v. Wells, supra,* at page 484, quoting *Farino v. State* (1931), 203 Wis. 374, 380, 234 N. W. 366, stating: " 'In the absence of evidence to the contrary, he who takes the life of another by the infliction of a wound naturally and probably calculated to produce death is presumed to have intended that result and to be guilty of murder in the first degree under our statutes. . . .' "

[14] *State v. Wells, supra.*

[15] *Id.* at pages 481, 482.

the victims were senior citizens "living alone and suffering the infirmities of advancing years."[16]

*Nature of assault.* In the murder case, the assailant clubbed the victim to the floor, jumped on him as he lay prone, and continued or renewed beating him about the head. In the case before us, one of the three assailants knocked the victim to the ground and, as he lay helpless, all three jumped on him and beat and kicked him. In both cases, we deal with a two-stage assault and, as to the second stage, "it cannot be contended that the blows were intended or required to remove the possibility of spirited resistance by the . . . victim, by then knocked prone, rendered helpless. . . ."[17]

*Type of weapon.* In the murder case, the weapon of the single assailant was a family-sized soda water bottle, used to rain blows at the head of the aged victim. In the case before us, the weapons were the fists and, more injury-inflicting, the boots or shoes of the three assailants used to rain kicks at the prostrate body of their aged victim. As to both pop bottles and shoes, it is correct to observe that the harm-inflicting aspect of each "derives from the manner and circumstances surrounding its use as much as from its physical properties."[18]

*Motive for assault.* In the murder case, the motive for the assault was robbery, the defense contention being that the assailant intended to take the victim's money, not his life. In the case before us, there is no motive apparent for a senseless and savage beating and kicking in a completely unprovoked assault. In both cases, there was an "immediate resort to violence"[19] which in the case before us is not explainable at all if it was not intended to inflict physical harm.

[16] *Id.* at page 481.
[17] *Id.* at pages 485, 486.
[18] *Id.* at page 484.
[19] *Id.* at page 482.

*Extent of injuries.* In the murder case, the victim sustained four scalp lacerations and a skull fracture and subsequently died from the head injuries inflicted. In the case before us, before the continuing attack was interrupted by the appearance of the two ladies on the porch and the shouting, the victim received two broken ribs from the kicking or stomping and was confined to a hospital from April 18th to April 23d. In the murder case, the court rejected defendant's contention that he "must be held to have intended only to take his victim up to the doorstep of death . . . ."[20] So, in the case before us, the contention must be rejected that the three assailants, if not interrupted, must be held to have intended no more bodily harm than they had in fact inflicted at the time of the interruption.

*Interruption of assault.* In the murder case, the assailant did not stop beating the old man until he became aware that he was being observed by a bystander who was approaching, hammer in hand. In the case before us, the three assailants stopped beating and kicking the old man at the exact time when the two ladies stepped on the porch and the shouting began. In both cases, it is an entirely reasonable inference that the beatings stopped or were interrupted by what the statute terms "the intervention of another person or some extraneous factor."[21]

In the murder case, considering all of the facts and circumstances involved in the assault by the single assailant, this court concluded, "That [the] evidence clearly sustains the finding of presumptive intent to kill, not rebutted by the circumstances here."[22] We deal with establishing, not an intent to kill, but only an intent to cause great bodily harm. Considering all of the facts and

---

[20] *Id.* at page 483.
[21] Sec. 939.32, Stats.
[22] *State v. Wells, supra,* at page 486.

circumstances involved in the assault by the three assailants in the case before us, we conclude that the evidence clearly sustains and supports the jury finding of presumptive intent to cause great bodily harm, not rebutted by the circumstances here.

*Conduct of the trial.*

Defendant additionally contends that an unprejudiced jury would have found the defendant innocent, and further contends that the jury was prejudiced by the conduct and questions of the trial court, especially when the trial court asked Mr. Kopp if he had any doubts as to the identity of his attackers. The specific reference is to the trial court asking the victim of the assault, after cross-examination had concluded, "Sir, is there any doubt in your mind today as to who the two men are who attacked you on April 18, 1970?" The complaining witness answered, "There is no doubt in my mind who they are." No objection was made at the time of trial to this question, nor was objection entered to any other question asked or comment made by the trial court. As is often enough the case, postconviction counsel finds improper what trial counsel did not find objectionable. Clearly, the right to raise the issue on appeal was lost by the failure to object at the time of trial. However, on the right of trial courts to question witnesses, we note that the rule in this state is, "a trial court may question a witness called by the parties in order to clarify received testimony, providing the court does not overtly express his view of the matters in issue. While the court cannot function as a partisan, it may take necessary steps to aid in the discovery of truth." [23] The question asked by the trial court does not offend against this rule. Other comments and colloquies which postconviction counsel

[23] *State v. Nutley* (1964), 24 Wis. 2d 527, 562, 129 N. W. 2d 155.

objects to clearly relate to the fact that the complaining witness was an elderly gentleman, given to narrative responses and a tendency to ramble discursively. For example, on one occasion during the trial when defense counsel interrupted a rambling response by the complaining witness, the court said, "Let him answer. This is an elderly gentleman." Defendant's trial counsel answered, "I understand." Clearly, both court and counsel recognized and understood the problem presented. As with children of tender years called to the witness stand, so it is with those senior citizens who exhibit signs of the inexorable consequences of the aging process. Some accommodations to witnesses of tender or advanced years is called for on the part of court and trial counsel and, on balance, on the entire record, such consideration was here shown by both. Under the adversary system, trial court and trial counsel have distinct and different roles to assume, but they share a responsibility for the proper conduct of the trial. Court and counsel are participants, not spectators, in the judicial process.

As to the role of the trial judge in the conducting of judicial proceedings, it is appropriate to recall the words of the Honorable LEARNED HAND who once observed: "A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." [24]

*By the Court.*—Judgment affirmed.

HALLOWS, C. J. *(dissenting).* I think there is insufficient evidence to sustain a conviction for attempted aggravated battery. The trial court apparently was of the opinion that if the assault had continued without interruption Reinhold Kopp would have been seriously injured and, applying the rule that a person intends the natural consequences of his acts, Willis would have had sufficient

[24] *United States v. Marzano* (2d Cir. 1945), 149 Fed. 2d 923, 925.

intention to commit the crime of aggravated battery. To me, this is pure speculation and not proof beyond a reasonable doubt, which is required in criminal cases. There is no evidence of any animosity between Willis and Kopp, or for that matter any reason why Willis should strike Kopp. The majority view will make every simple battery which is interrupted a crime of attempted aggravated battery.

Aggravated battery requires an intent to cause "great bodily harm," which is defined in sec. 939.22 (14), Stats., as bodily injury which creates "a high probability of death" or which causes "serious permanent disfigurement . . . a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury." The type of injury required is illustrated in *Irby v. State* (1971), 49 Wis. 2d 612, 182 N. W. 2d 251, wherein the victim was stabbed in the stomach, cut in the face, inflicted with four lacerations on his right arm, taken to a hospital in an apparent unconscious condition where he remained one week, spending the first two and one-half days in intensive care because of a collapsed lung and because of the degree of bleeding caused by the severance of an intercostal artery or vein in the lower chest region, all of which resulted in a total loss of approximately one quart of blood. That no such serious injury was involved in the instant case is apparent.

In our previous cases dealing with aggravated battery, which first found its way into our law in 1955 as a part of the criminal code, the intent to do great bodily harm was inferred from the end result together with the presumption that one intends the natural and probable consequences of his acts. *State v. Gould* (1973), 56 Wis. 2d 808, 202 N. W. 2d 903; *State v. Bronston* (1959), 7 Wis. 2d 627, 97 N. W. 2d 504, rehearing denied, 98 N. W. 2d 468. In *attempted* aggravated battery, on the other hand, where there was no end result of great bodily harm, a

finding of intent to cause such harm was based upon the potentiality of the offender's act and other facts. Thus, in *Bronston,* the requisite intent for attempted aggravated battery could be inferred from the fact that the blow therein struck might easily have caused a fractured skull, as the complaining witness was struck on the back of her head with a ratchet-type wrench wielded by the assailant, who was attempting a robbery. In *Dunn v. State* (1972), 55 Wis 2d 192, 197 N. W. 2d 749, we considered the evidence sufficient to sustain a conviction of attempted aggravated battery where the defendant, in a fracas with his victim, struck the latter on the head with a hammer and kicked him in the face. There was also some evidence of animosity. In the instant case, there was no instrumentality, such as a hammer or wrench, which would have the potentiality of causing great bodily harm and which would indicate that Willis had the necessary intent to accomplish an aggravated battery and no motive was shown for the battery.

In relying upon *State v. Wells* (1971), 51 Wis. 2d 477, 187 N. W. 2d 328, for the drawing of somewhat irrelevant analogies, the majority opinion ignores the primary distinction between that case and this one. In *Wells,* a completed crime rather than an attempt was involved. The majority there drew upon a presumption that one who takes the life of another by the infliction of a wound naturally calculated to cause death in fact intends death as the result. In the instant case, the majority takes this rationale one step further by assuming the result and from that assuming an intent to cause the result assumed. This I cannot do under the rule that a defendant must be proved guilty beyond a reasonable doubt. I would accordingly reverse on this issue.

I am authorized to state Messrs. Justices WILKIE and HEFFERNAN join in this dissent.