MULLER, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 77-204-CR. Argued November 7, 1979.—Decided March 4, 1980.*

(Also reported in 289 N.W.2d 570.)

452

Kenley A. Muller, plaintiff in error, was convicted of first-degree murder, contrary to sec. 940.01, Stats., following a jury trial. He was sentenced to life imprisonment, and writs of error issued to review the judgment of conviction and order denying his motion for a new trial.

For the plaintiff in error the cause was argued by *Richard M. Sals,* assistant state public defender, with

whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error there were briefs by *Bronson C. La Follette,* attorney general, and *Betty R. Brown,* assistant attorney general, and oral argument by *Chris Heikenen,* assistant attorney general.

CONNOR T. HANSEN, J. On review, Muller (hereinafter defendant) raises issues concerning the submission of the verdict, admission of evidence and instructions to the jury.

Defendant Muller was convicted of the murder of Buford B. Troxel, sometimes called Pee Wee. On the date originally set for trial, the state moved for a continuance because Peggy Muller, wife of the defendant and an important state witness, was not available. Five witnesses testified as to numerous unsuccessful attempts to locate and serve subpoenas on Peggy Muller and her children. She had not obeyed a subpoena which had been left with her husband, the defendant, with whom it was believed she was then living. The trial court granted the continuance to a day certain and a body attachment was issued for arrest.

The trial commenced on the day certain and the state presented the testimony of 23 witnesses. The crime occurred in the city of Beloit.

Officer Harold Smith testified that at 2:19 a.m. on June 26, 1976, he was dispatched to 1147½ Partridge avenue. When he arrived he saw Peggy Muller standing in the driveway. She was dressed in a robe and slippers and had a coat over her robe. She seemed nervous and frightened and kept looking up and down the street as she talked. She told Smith that she had just received a telephone call from her estranged husband, Kenley Muller, and that he threatened to shoot her and her boyfriend who was in the apartment. When asked what

type of vehicle Muller would be driving, she told the officer it would be an orange Ford Bronco, and when asked what type of guns he might have, she said she did not know.

Officers Kevin W. Connors and Robbie Ray Lowery testified that they responded to a dispatch regarding a shooting at 1147½ Partridge avenue in Beloit on June 26, 1976, at approximately 2:57 a.m.

Connors testified that when he arrived at the house, he saw two women standing in the driveway. They were later identified as Peggy Muller and Susan Lund. Peggy Muller was very excited, upset and crying, and said that she "knew he would come back on foot and shoot him." Connors proceeded to the rear of the house, went up the stairs to Peggy Muller's apartment, noticed that the kitchen door had been broken open, and proceeded down a hallway to the bedrooms. In one bedroom of the apartment he saw two small children on the bed and a white male lying on the floor, later identified as Troxel, partially leaning against a bed and partially against a closet door frame. He observed bullet holes in the right side of the man's neck, in his left shoulder and directly over the area of his heart. The paramedics arrived and pronounced Troxel dead.

Officer Lowery testified that when he arrived at the apartment, Peggy Muller told him that Arnie (the defendant) had shot Pee Wee (Troxel) ; and Randy Lund, who was on the porch, told him the victim was upstairs. When he asked Peggy Muller who was responsible, she said that Kenley A. Muller was responsible and that he was driving an orange Ford Bronco but he left on foot. This information, together with the fact that the defendant had guns or rifles in his possession, was dispatched to area law enforcement officers.

Susan Lund, who lived in the apartment below Peggy Muller at the time of the shooting, testified that Peggy

Muller awakened her on the morning of June 26, 1976, by pounding on her door and saying "Please call the cops, Arn just shot Pee Wee." While they were waiting for the police, Peggy Muller told Susan Lund that Arnie had broken in through the kitchen door, that he had a gun and she had heard shots when she got downstairs. Susan Lund also testified that she had met Pee Wee Troxel when he was visiting Peggy, and that Kenley Muller visited Peggy frequently at her apartment.

During the presentation of the state's case evidence was introduced to prove that the prosecution had exercised due diligence in attempting to subpoena Peggy Muller to testify at the trial, but was unable to successfully serve the subpoena and therefore could not procure her attendance. On the evidence presented, the court found the state had established that Peggy Muller was unavailable.

The testimony of Peggy Muller taken at the preliminary hearing was then read into evidence at the trial. At the preliminary hearing, when Peggy Muller was asked about what had occurred on June 26, 1976, at about 2:57 a.m., she claimed a loss of memory. The state impeached her credibility by use of a prior inconsistent statement given by her to the police on June 26, 1976. It was this testimony from the preliminary hearing which was read into evidence at trial.

This prior inconsistent statement of Peggy Muller introduced at the preliminary hearing reflected that on June 26, 1976, she was separated from the defendant. At 2:57 a.m. she was in the bedroom of her apartment with Buford Troxel when she heard a loud noise outside. In this statement given to the police, Peggy Muller stated that she was sitting on the edge of the bed looking out of the bedroom window and saw the defendant. She unlocked the bedroom door which exited onto the porch and told Pee Wee to go. He refused, indicating that he was going to face the defendant. Pee Wee walked out

of the bedroom and down the hall toward the kitchen. Peggy Muller went out the other bedroom door onto the porch and toward the steps. In so doing, she saw the defendant standing in the kitchen with a gun in his hand. She saw the defendant walk from the kitchen into the hall, heard two shots, ran to the first floor apartment and banged on the front door and bedroom window of Randy and Susan Lund. She received no response, so she ran down the street to another house and knocked on the door. While she was there she saw the defendant running down the street.

In her statement Peggy Muller also said that after Officer Lowery gave her children to her, her daughter kept saying that "Arnie had killed him."

Portions of a deposition of Peggy Muller taken on August 26, 1976, in a custody proceeding between Peggy Muller and her former husband, Richard Hanson, were also read into evidence. Hanson was attempting at that time to get custody of their daughter, Shelley Hanson, and Peggy Muller was questioned by Hanson's attorney regarding the incident on June 26, 1976. Peggy Muller's description of her knowledge of the crime was basically the same as she had given the police on June 26, 1976.

A pathologist testified that an autopsy was performed on the body of Buford Troxel and revealed that the cause of death was a gunshot wound in the heart.

Douglas A. Witt, Rock County Deputy Sheriff, testified that on June 26, 1976, at 3:31 a.m. he was sent to Walker Road to investigate a report that an injured person was lying alongside the road. When responding to this assignment, he saw the defendant's orange Bronco parked on the shoulder of Walker Road, and as he proceeded to the residence he saw a body, later identified as the defendant, lying on the ground.

Officer Richard Pomeroy of the Beloit police department testified that at 3:47 a.m. he went to the scene on Walker Road. He inspected the defendant's Ford Bronco

parked on Walker Road and observed a bullet hole in the windshield which had been made by a projectile going from the inside to the outside. He saw a handgun on the hump in the center of the floor of the Bronco, several .22 caliber live cartridges scattered on the front seat, blood on the front seat, and a pellet pistol on the floor in the back of the vehicle.

Ronald Northrup, a paramedic, testified that while taking the defendant to the hospital, he asked the defendant if the defendant realized what he had done and the defendant replied, "Yes." Northrup then asked him, "Do you feel sorry or have any remorse for what you done?" The defendant said, "Negative, in fact, I would do it again."

The defense presented the testimony of the defendant's sister, Judy Pulaski, his aunt, and of the defendant.

Judy Pulaski testified that in April or May, 1976, Peggy Muller moved out of the house she was sharing with her husband, Kenley Muller, and took an apartment by herself. In June, 1976, Pulaski informed the defendant that his wife, Peggy, was being unfaithful to him. The next time Pulaski discussed Peggy's affair with the defendant was approximately one hour before the shooting on June 26, 1976. At that time she told the defendant the name of the man Peggy had been seeing and what type of car the man drove. Pulaski had learned the man's name was Pee Wee Troxel from several acquaintances and it was common knowledge that he and Peggy were going together. Pulaski had seen Troxel's car at Peggy's apartment on several occasions and had seen him there once.

The defendant testified that at the beginning of June, his sister told him that Peggy was seeing another man, and he could not believe it. After midnight on June 26, 1976, he went over to his sister's house and she told him

that the man Peggy was seeing was Pee Wee Troxel and described his car. The defendant was mad and upset, so he left his sister and telephoned Peggy from a phone booth. They talked about Troxel. The defendant told her he was coming up to see her, and she told him not to come up. The defendant drove over to Peggy's apartment, saw Troxel's car, and parked his car behind it. When he saw the car, he became very mad, ran across the yard, ran up the stairs and kicked the door in. He went into the living room, saw both children sleeping, proceeded down the hall to the bedroom and saw a hand come out of the bedroom and it had a pistol in it. The defendant grabbed the hand with the pistol, swung the person around, and the pistol broke free of his grip and discharged. The defendant could not remember anything after that. The defendant also testified that he and Peggy had lived together since the shooting.

The jury found the defendant guilty of first-degree murder and, after denial of postconviction motions, the defendant brings this review.

The issues presented on appeal are:

1. Did the trial court err in refusing to submit to the jury the lesser included instruction on manslaughter contrary to sec. 940.05 (1), Stats.?

2. Did the trial court err in admitting into evidence portions of a deposition taken during a custody proceeding between the defendant's wife and her former husband?

3. Did the trial court abuse its discretion in admitting into evidence a statement made by the defendant's wife to the police concerning a telephone call made to her by the defendant?

4. Did the instructions of the trial court advising the jury of the legal presumption concerning the intent to kill deny the defendant his constitutional right to due process?

# I.

The defendant contends that the trial court erred in refusing to instruct upon the crime of manslaughter proscribed by sec. 940.05(1), Stats., which provides:

"Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than 10 years:
"(1) Without intent to kill and while in the heat of passion; . . ."

This court has on several occasions defined "heat of passion" that will reduce what would otherwise be murder to manslaughter:

" 'That which will constitute "the heat of passion" which will reduce what would otherwise be murder to manslaughter "is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition." *State v. Stortecky* (1956), 273 Wis. 362, 372, 77 N.W. (2d) 721. It has been said that, " 'the provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror.' " 21 Am. & Eng. Ency. of Law (2d ed.), p. 177, quoted in *Johnson v. State* (1906), 129 Wis. 146, 159, 108 N.W. 55.' " *State v. Hoyt*, 21 Wis.2d 284, 290, 291, 128 N.W.2d 645 (1964).[1]

---

[1] *See also: State v. Mendoza*, 80 Wis.2d 122, 157, 258 N.W.2d 260 (1977); *Hayzes v. State*, 64 Wis.2d 189, 196, 218 N.W.2d 717 (1974); *Marks v. State*, 63 Wis.2d 769, 777, 218 N.W.2d 328

The standard for determining whether an instruction on a lesser included offense should be submitted to the jury was stated in *Garcia v. State,* 73 Wis.2d 174, 185, 186, 242 N.W.2d 919 (1976):

"The rule on instructions on lesser-included offenses was discussed recently in *Harris v. State* (1975), 68 Wis.2d 436, 439, 440, 228 N.W.2d 645, quoting *State v. Anderson* (1971), 51 Wis.2d 557, 560, 187 N.W.2d 335, and *State v. Bergenthal* (1970), 47 Wis.2d 668, 675, 178 N.W.2d 16:

" 'The general rule for determining when instructions on lesser degrees of homicide should be submitted to the jury is:

" ' "To justify submitting lesser degrees of homicide than that charged in the information, there must be a reasonable ground in the evidence for acquittal on the greater charge and for conviction on the lesser charge."

" 'In *State v. Bergenthal* we further said:

" ' "The key word in the rule is 'reasonable.' The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a jury. Only if 'under a different, but reasonable view,' the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury." ' "

The evidence in this case shows that in late May or early June, 1976, the defendant's sister told him that his wife, Peggy, was being unfaithful to him. He was very sad about this and did not want to hear about it. One hour before the shooting while defendant was at his sister's house, she told him who the person was that his wife was seeing and what type of car the man drove.

(1974); *Ameen v. State,* 51 Wis.2d 175, 182, 183, 186 N.W.2d 206 (1971); *State v. Lucynski,* 48 Wis.2d 232, 234, 235, 179 N.W.2d 889 (1970).

After she told him this, the defendant was unhappy, depressed and upset and did not know whether to believe it. After he left his sister's house, he called his wife and asked her if she was going with anyone. She replied negatively. After he told her he had reliable witnesses that said she was, she admitted that she was going out. He told her they were going to talk about it and that he was coming up. She told him not to come up, and when he asked if her boyfriend was there, she replied "no," but told him not to come up and hung up the phone. The defendant went over to his wife's apartment and the car which his sister had described to him was parked in front of the house. He was furious, ran up the stairs, and kicked in the kitchen door. He went into the living room and saw both children sleeping, and went down the hallway to the bedroom. The defendant remembers the pistol being shot once, but testified that he could not remember anything after that. The evidence also showed that three bullets entered the man's body.

This is not evidence showing sudden resentment or such "reasonable, adequate provocation" as would overcome or suspend the exercise of judgment of an ordinary man, since the defendant was aware one month prior to the crime that a man had stayed overnight at his wife's apartment. Cf. *Zenou v. State,* 4 Wis.2d 655, 91 N.W.2d 208 (1958); *State v. Bond,* 41 Wis.2d 219, 163 N.W.2d 601 (1969); *State v. Lucynski,* 48 Wis. 2d 232, 179 N.W.2d 889 (1970); and *Krebs v. State,* 64 Wis.2d 407, 219 N.W.2d 355 (1974).

Furthermore, the evidence does not indicate sufficient provocation to justify carrying a gun when the defendant went to his wife's apartment. Therefore, the trial court did not err in refusing to submit the lesser offense of manslaughter.

## II.

The trial court admitted in evidence the deposition of Peggy Muller taken during a custody proceeding between her and her former husband. The defendant contends that admission of this evidence denied him his right to confrontation.

Sec. 908.045, Stats., provides:

". . . **Hearsay exceptions; declarant unavailable.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
". . . .
"(4) STATEMENT AGAINST INTEREST. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborated."

The deposition of Peggy Muller was admissible under this subsection, because she was unavailable as a witness; her statements tended to subject her to criminal liability since she admitted having sexual relations with Troxel; her statements made her an "object of disgrace," and were even against her proprietary interest since they provided a foundation for depriving her of custody of her daughter.

However, compliance with a state's hearsay rule does not insure compliance with the constitutional mandate for

confrontation in a criminal case.[2] In *State v. Olson,* 75 Wis.2d 575, 588–591, 250 N.W.2d 12 (1977), this court analyzed the federal law on the right of confrontation and stated:

"The confrontation right is not absolute. However valuable to the accused, the right gives way to other legitimate considerations in the criminal trial process. As we said in *Lenarchick,* the United States Supreme Court appears to have concluded that there are instances where even though there is no face-to-face confrontation, the due process and confrontation requirements are satisfied. Under some circumstances it appears that an un-cross-examined statement is clothed with special indicia of trustworthiness. The hearsay rule and its exceptions may at times satisfy the degree of trustworthiness, but the satisfaction of the hearsay requirements does not necessarily satisfy the confrontation rule. Determining whether the right to confront and to cross-examine must give way in any particular instance 'calls into question the ultimate " 'integrity of the fact-finding process' " and requires that the competing interest be closely examined.' Courts have balanced such factors as: whether the witness is unavailable and the prosecution has made good faith and reasonable efforts to procure the witness; whether the evidence has high standards of assurance of reliability or trustworthiness; whether the evidence is admissible under an exception to the hearsay rule; whether the statements introduced are subject to divergent views; whether there is high probability of assurance that the cross-examination of the witness would not cast any doubts on the admitted statements; whether the defendant's objection to the evidence was raised via other testimony during the trial; whether the defendant had been afforded prior opportunities for cross-examination of the witness; whether the evidence is collateral or probative of an element of the crime; whether the evidence ties the defendant directly to the crime; and whether the practical considerations of convenience and speedy trials outweigh the inconvenience of producing the witness." (Footnotes omitted.)

[2] *Bergeron v. State,* 85 Wis.2d 595, 616, 271 N.W.2d 386 (1978); *State v. Olson,* 75 Wis.2d 575, 585, 586, 250 N.W.2d 12 (1977); *State v. Lenarchick,* 74 Wis.2d 425, 432, 247 N.W.2d 80 (1976).

■Under the facts of this case admission of the deposition did not violate the defendant's right to confrontation. This conclusion is based on the following factors: Peggy Muller was unavailable as a witness; the state made a good faith and reasonable effort to produce her as a witness; the hearsay evidence meets high standards of assurance of reliability or trustworthiness; the evidence is admissible under an exception to the hearsay rule; the defendant had an opportunity at the preliminary examination to cross-examine Peggy Muller; and the evidence is directly probative of the elements of the crime charged.

### III.

The defendant next argues that the trial court abused its discretion in admitting testimony of Officer Harold Smith regarding a statement made to him by Peggy Muller at her apartment at approximately 2:19 a.m. on June 26, 1976, approximately a half hour before the shooting of Buford Troxel. Smith testified that Peggy Muller told him that she had just received a phone call from the defendant, and that he threatened to come over and shoot her and her boyfriend, who was then in the apartment. The trial court, over defense counsel's objection, ruled that this hearsay statement was admissible as an excited utterance.

■This court has held on numerous occasions that the decision on the admissibility of a hearsay statement as an excited utterance is within the discretion of the trial court.[3] This court will uphold the exercise of such dis-

---

[3] *Christensen v. Economy Fire & Casualty Co.*, 77 Wis.2d 50, 55, 252 N.W.2d 81 (1977); *State v. Lenarchick, supra,* at 450; *La Barge v. State,* 74 Wis.2d 327, 341, 246 N.W.2d 794 (1976). *See also: Cossette v. Lepp,* 38 Wis.2d 392, 398, 157 N.W.2d 629 (1968); *Cornwell v. Rohrer,* 38 Wis.2d 252, 259, 156 N.W.2d 373

cretion unless the record shows that the ruling was manifestly wrong and an abuse of discretion.[4]

Sec. 908.03, Stats., provides:

". . . The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
". . . .
"(2) EXCITED UTTERANCE. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

Therefore, before a statement is admissible as an excited utterance, there must have been (1) a "startling event or condition" and (2) the declarant must have made the statement relating to the startling event or condition while "under the stress of excitement caused by the event or condition."

Clearly, Peggy Muller's statement related to a startling event. The receipt of a telephone call by a wife shortly before 2:19 a.m. from her estranged husband threatening to come over to her apartment and shoot her and her boyfriend, who is spending the night in the apartment, is a startling event, particularly when the wife, as in this case, believes that her husband will carry out his threat, and knows that he has the transportation and guns necessary to do so.

As for the second element of the excited utterance exception, this court stated in *Christensen v. Economy Fire & Casualty Co.*, 77 Wis.2d 50, 56, 57, 252 N.W.2d 81 (1977):

"The excited utterance exception, which was formerly part of the *res gestae* exception, is based upon sponta-

(1968); *State v. Smith*, 36 Wis.2d 584, 595, 153 N.W.2d 538 (1967); *Rudzinski v. Warner Theatres*, 16 Wis.2d 241, 248, 114 N.W.2d 466 (1962).

[4] *State v. Lenarchick, supra,* at 450; *La Barge v. State, supra,* at 341; and *Cornwell v. Rohrer, supra,* at 259.

neity and stress which endow such statements with sufficient trustworthiness to overcome the reasons for exclusion of hearsay. In determining whether a statement qualifies as an excited utterance, the important factors for the judge's consideration are timing and stress. As we said in *Wilder v. Classified Risk Ins. Co.*, 47 Wis.2d 286, 292, 177 N.W.2d 109 (1970), a case no less applicable because it concerned the older *res gestae* exception:

" 'It must be shown that the statement was made so spontaneously or under such psychological or physical pressure or excitement that the rational mind could not interpose itself between the spontaneous statement or utterance stimulated by the event and the event itself. The psychological basis for the *res gestae* exception is that people instinctively tell the truth but when they have time to stop and think they may lie. . . .' " (Footnote omitted.)

The time period between the triggering event and the utterance is the key factor, and under sec. 908.03(2), Stats., time is measured by the duration of the condition of excitement rather than mere time elapse from the event or condition described. *Christensen v. Economy Fire & Casualty Co.*, *supra*, at 57. "The significant factor is the stress or nervous shock acting on the declarant at the time of the statement." *Id.* at 57, 58. A statement of a declarant whose condition at the time of his declaration indicates that he is still under the shock of his injuries or other stress due to special circumstances will be admitted. *Id.* at 58.

The evidence in this case shows that the police arrived at the Partridge avenue address at 2:19 a.m. after Peggy Muller received the threat from the defendant. She was standing in the driveway, dressed in a robe and slippers with a coat over her robe. She was nervous, frightened, was wringing her hands, and kept looking up and down the street as she talked to the police officer.

Peggy Muller's statement to Officer Smith was made when she was still under stress caused by the threatening

telephone call. The trial judge was not manifestly wrong and he did not abuse his discretion in admitting the statement into evidence.

## IV.

The defendant finally argues that certain of the jury instructions denied him his right to due process of law. The defendant claims the instruction had the effect of relieving the state of the burden of proving the elemental fact of intent in this first-degree murder case and shifted the burden of persuasion on the issue of intent to the defendant.[5]

The cause of the death of the victim is not at issue. The defendant and his wife were separated and the defendant had known for some time that another man had spent a number of nights at his wife's apartment. On the night of the incident the defendant telephoned his wife and told he was coming over and would shoot her and her boyfriend. He went to the apartment with a gun he had recently purchased and broke into the apartment. His wife fled. At close range, he shot at Troxel four times with the gun which had to be cocked after each shot. Three of the bullets entered the body of Troxel; one of them entered Troxel's heart and caused his death.

The trial court, without defense objection, gave the instruction on first-degree murder where the cause of death is not in issue, which is identified as Wisconsin Jury Instruction—Criminal 1100. The instruction first defined the crime of first-degree murder. It then in-

[5] Such a conclusion was reached by the Court of Appeals in *Adams v. State*, 92 Wis.2d 875, 289 N.W.2d 318 (Ct. App. 1979), where the court held that the language in Wisconsin Jury Instruction—Criminal 1105 in effect shifted the burden of proof to the defendant and relieved the state of proving the element of intent beyond a reasonable doubt. A petition for review has been filed in that case by the State of Wisconsin.

structed the jury that before a defendant may be found guilty of that crime "the State must prove by evidence which satisfies you beyond a reasonable doubt" that the two elements were present. The elements were then identified and one of them was "that the defendant intended to kill Buford Troxel." The trial court then instructed the jury on the meaning of the phrase "intent to kill," stating:

"Under the Criminal Code, the phrase 'intent to kill' means the mental purpose to take the life of another human being. This intent to kill is the element of this offense that distinguishes it from all other degrees of murder. While the law requires, in order to constitute murder in the first degree, that the killing shall have been intended, it does not require that the intent to take human life shall exist for any particular length of time before the crime is committed, or that the killing should have been brooded over, considered or reflected upon for a week, a day, an hour, or even for a minute. There may be no appreciable space of time between the formation of the intent to kill and the act of killing. If sufficient deliberation was had to form an intent to take life and to put that purpose into execution by destroying life, then there was a sufficient mental purpose to constitute murder in the first degree. The intention to kill, which is an essential element of murder in the first degree, is no more or less than the mental purpose to take human life, formed on the instant preceding the fatal act or sometime theretofore, and which continued to exist at the time of the fatal act.

"While this intent to kill must be found as a fact before you can find the defendant guilty of murder in the first degree, it must be found, if found at all, from his acts and his words and statements, if any, bearing upon his intent. You cannot look into a man's mind to find out his intent. *When there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all the natural, probable, and usual consequences of his deliberate acts. If one person assaults another violently with a dangerous weapon likely to kill, and the person thus assaulted dies therefrom,*

*then, when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended.*
"*. . . .*

"If you are satisfied beyond a reasonable doubt from the evidence in this case that the defendant did commit an act of shooting which caused the death of Buford Troxel at the time and place charged in the information, and that at any time before doing such act the defendant had formed in his mind the purpose to take the life of Buford Troxel, and that of the act of shooting was done by the defendant in pursuance of such mental purpose, then you should find the defendant guilty of murder in the first degree as charged in the information.

"If, however, you are not so satisfied, then you must not find the defendant guilty of murder in the first degree, . . . ." (Emphasis supplied.)

The emphasized portion of the above instruction is the language challenged here.[6]

This court has repeatedly approved the presumption language contained in the present jury instructions, *Johnson v. State,* 85 Wis.2d 22, 33, 270 N.W.2d 153 (1978); *Fells v. State,* 65 Wis.2d 525, 534, 223 N.W.2d 507 (1974); *Austin v. State,* 52 Wis.2d 716, 721, 190 N.W.2d 887 (1971); *State v. Carlson,* 5 Wis.2d 595, 604, 93 N.W.2d 354 (1958); *Hedger v. State,* 144 Wis. 279,

---

[6] On September 30, 1977, the Uniform Criminal Jury Instructions Committee approved the following as a replacement for the paragraph containing the emphasized language in the criminal jury instructions given in the instant case:

"Intent to—must be found as a fact before you can find the defendant guilty of—. You cannot look into a person's mind to find out his/her intent. You may determine such intent directly or indirectly from all the facts in evidence concerning this offense. You may consider any statements or conduct of the defendant which indicate his/her state of mind. You may find intent to— from such statements or conduct. You are the sole judges of the facts and you must not find the defendant guilty unless you are satisfied beyond a reasonable doubt that the defendant intended to—."

303, 128 N.W. 80 (1911). This court has specifically held the language in the instruction to be proper in a case where the defendant contended that this language shifts the burden of proof to the defendant, *Greer v. State*, 40 Wis.2d 72, 77, 161 N.W.2d 225 (1968), cert. den. 393 U.S. 1122. This court has also on numerous occasions approved, in the context of challenges to the sufficiency of the evidence or requests for an instruction on lesser included offenses, the rule that a person is presumed to intend the natural and probable consequences of his acts. *Lofton v. State*, 83 Wis.2d 472, 478, 479, 266 N.W.2d 576 (1978).[7]

In *Greer v. State, supra,* the defendant sought reversal of his conviction for first-degree murder, claiming that the instruction on intent permits a finding of specific intent based solely on a presumption, thus shifting the burden of proof to the defendant regardless of the circumstances. This court quoted an instruction similar to that involved here, italicized the language "when there are no circumstances to prevent or rebut the presumption," and held:

"Defendant claims this instruction permits a finding of specific intent based solely on presumption, shifting the burden of proof to the defendant regardless of cir-

---

[7] *See: Loveday v. State*, 74 Wis.2d 503, 515, 247 N.W.2d 116 (1976); *Garcia v. State*, 73 Wis.2d 174, 183, 242 N.W.2d 919 (1976); *Smith v. State*, 69 Wis.2d 297, 303, 304, 230 N.W.2d 858 (1975); *State v. Van Ark*, 62 Wis.2d 155, 167, 215 N.W.2d 41 (1974); *State v. Cydzik*, 60 Wis.2d 683, 697, 211 N.W.2d 421 (1973); *State v. Gould*, 56 Wis.2d 808, 813, 814, 202 N.W.2d 903 (1973); *State v. Schenk*, 53 Wis.2d 327, 332, 193 N.W.2d 26 (1972); *Hawpetoss v. State*, 52 Wis.2d 71, 80, 187 N.W.2d 823 (1971); *State v. Wells*, 51 Wis.2d 477, 484, 187 N.W.2d 328 (1971), cert. den. 406 U.S. 907 (1972); *Zebrowski v. State*, 50 Wis.2d 715, 722, 185 N.W.2d 545 (1971); *Gelhaar v. State*, 41 Wis.2d 230, 243, 163 N.W.2d 609 (1969), cert. den. 399 U.S. 929 (1970); *State v. McCarter*, 36 Wis.2d 608, 612, 153 N.W.2d 527 (1967).

cumstances. The italicized portion correctly limits the application of the presumption, but one who stabs another in the neck with a knife must be held to understand that death is a natural and probable consequence of such act. This particular instruction has been used before and held to be proper. . . ." *Greer v. State, supra,* at 77.

The jury instructions which are challenged here were criticized by the U. S. Court of Appeals in *Hughes v. Matthews,* 576 F.2d 1250 (7th Cir. 1978), where that court considered the validity of the Wisconsin instruction on presuming intent where the trial court held the presumption could not be rebutted by psychiatric evidence that the defendant lacked specific intent. The court held that the district court was correct in holding that by instructing the jury to presume intent if not rebutted, and by excluding psychiatric evidence offered to rebut the presumption, Wisconsin set up a conclusive presumption which unconstitutionally relieved the prosecution of the burden of proving the element of specific intent beyond a reasonable doubt. The court also stated that were this simply a case where jury instructions on presuming intent improperly left the jury with the impression that the petitioner had the burden of persuasion to disprove an element of the crime, the court would affirm the writ of habeas corpus and send the case back to the state court for a new trial with directions to avoid the suspect instructions. This court, in *Schimmel v. State,* 84 Wis.2d 287, 301, 267 N.W.2d 271 (1978), interpreted the opinion in *Hughes* as not condemning the presumption of intent itself, but only its combination with the rule excluding rebutting psychiatric testimony.

In *Cranmore v. State,* 85 Wis.2d 722, 271 N.W.2d 402 (Ct. App. 1978), the defendant claimed that the presumption language in the jury instruction relieved the state of the burden of proving beyond a reasonable doubt that the defendant intended to kill the victim and he was

therefore denied due process of law. That court relied on an analysis of the evidence in the case and the decision in *Lofton v. State, supra,* and concluded that the words and behavior of each of the defendants was sufficient to prove intent to kill beyond a reasonable doubt, and there was no error committed with respect to the jury instructions. This court denied review of the decision of the Court of Appeals.

In *Genova v. State,* 91 Wis.2d 595, 283 N.W.2d 483 (Ct. App. 1979),[8] the Court of Appeals was again faced with the issue of whether the presumption language in the instructions is constitutionally impermissible, and dealt with the issue at length. Comparing the jury instruction in that case with the instruction in *Sandstrom v. Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed.2d 39 (1979), the Court of Appeals concluded that the Wisconsin instructions were not constitutionally infirm and set forth 18 reasons for the conclusion it reached. That case involved a defendant who was convicted of theft, party to a crime, and the court pointed out that the jury instruction there analyzed contained the presumption language in one sentence, rather than the two-sentence presumption language in the instruction challenged in the instant case.

It is axiomatic that the burden of proving all the elements of a crime beyond a reasonable doubt rests upon the state. The United States Supreme Court has so held. *In re Winship,* 397 U.S. 358 (1970). *See also: Mullaney v. Wilbur,* 421 U.S. 684 (1975). The burden of proving intent, however, ordinarily can be borne only by presentation of circumstantial evidence, because intention is a mental process that necessarily must be proved through inferences drawn from the defendant's statements and actions. Thus, if the presumption language in the jury

---

[8] A petition for review has been filed by the defendant.

instruction in this case relieves the state of its duty to prove the element of intent beyond a reasonable doubt, it denies the defendant due process.

The United States Supreme Court's consideration of presumption language culminated in its consideration of the due process validity of the challenged instruction in *Sandstrom v. Montana, supra.* In that case the defendant was charged with and convicted of "deliberate homicide."[9] He admitted at trial that he had killed his victim, but argued that due to a personality disorder aggravated by alcohol consumption, he did not do so "purposely or knowingly." The trial court, over the due process objection of defense counsel, instructed the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts."

The United States Supreme Court concluded that the instruction was unconstitutional because it denied the defendant due process of law. The court held:

"Because David Sandstrom's jury may have interpreted the judge's instruction as constituting either a burden-shifting presumption like that in *Mullaney,* or a conclusive presumption like those in *Morissette* and *United States Gypsum Co.,* and because either interpretation would have deprived defendant of his right to the due process of law, we hold the instruction given in this case unconstitutional." *Sandstrom v. Montana, supra,* at 524, 99 S. Ct. at 2459, 2460, 61 L. Ed.2d at 51.

The teaching of *Sandstrom* is:

"The threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes. See *Ulster County Court v. Allen* [*ante,* at 157–163]. That determination requires careful attention to the words actually spoken to the jury, *ante,* at 157–159,

---

[9] Deliberate homicide is defined as purposely or knowingly causing the death of another human being. Mont. Rev. Codes, sec. 94–5–102 (Crim. Code of 1973).

n. 16, for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction. *Sandstrom, supra,* at —, 99 S. Ct. at 2454, 61 L. Ed.2d at 45.

The Supreme Court has identified two types of presumptions: permissive presumptions and mandatory presumptions. A permissive presumption, or permissive inference, allows, but does not require, the trier of fact to find an element of the crime (elemental fact) upon proof by the prosecution of another fact (basic fact), and it places no burden of any kind on the defendant. *Ulster County Court v. Allen,* 442 U.S. 140, 99 S. Ct. 2213, 2224, 60 L. Ed.2d 777, 792 (1979). A permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof. *Allen, supra,* at 157, 99 S. Ct. at 2224, 60 L. Ed.2d at 792. A permissive presumption does not violate due process of law.

A mandatory presumption requires that the trier of fact *must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with *some* evidence to rebut the presumption. *Allen, supra,* at 157, 99 S. Ct. 2224, 2225, 60 L. Ed.2d at 792.

A mandatory presumption which is irrebuttable is a conclusive presumption. *See: Morissette v. United States,* 342 U.S. 246 (1952); *United States v. United States Gypsum Co.,* 438 U.S. 422 (1978). A conclusive presumption is an irrebuttable direction by the trial court to find the elemental fact once the jury is convinced of the basic facts triggering the presumption. *Sandstrom, supra,* at 523, 99 S. Ct. at 2456, 61 L. Ed.2d at 46, 47. A mandatory presumption may also be rebuttable, that is, it requires the trier of fact, if satisfied as to the basic facts which trigger the presumption, to find the elemental fact *unless* the defendant offered evidence to the contrary. *Sandstrom, supra,* at 515, 99 S. Ct. at 2455, 61 L. Ed.2d at 45.

The *Sandstrom* court rejected both conclusive presumptions and rebuttable presumptions which shift the burden of persuasion to the defendant:

"First, a reasonable jury could well have interpreted the presumption as 'conclusive,' that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption. Alternatively, the jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions (and their 'ordinary' consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than 'some' evidence —thus effectively shifting the burden of persuasion on the element of intent. . . ." *Sandstrom, supra,* at —, 99 S. Ct. at 2456, 61 L. Ed.2d at 46, 47.

The state argued that, although the presumption was a rebuttable presumption, all the defendant had to do to rebut the presumption was produce *some* contrary evidence; at most it placed a *burden of production* on the defendant, but did not shift to the defendant the *burden of persuasion.* The court rejected this argument because it was possible that a reasonable juror could interpret the instruction as persuasion-shifting:

"We do not reject the possibility that some jurors may have interpreted the challenged instruction as permissive, or, if mandatory, as requiring only that the defendant come forward with 'some' evidence in rebuttal. However, the fact that a reasonable juror could have given the presumption conclusive or persuasion-shifting effect means that we cannot discount the possibility that Sandstrom's jurors actually did proceed upon one or the other of these latter interpretations." *Sandstrom, supra,* at 519, 99 S. Ct. at 2457, 61 L. Ed.2d at 48.

*Sandstrom* divided rebuttable presumptions into two kinds: (1) those that shift the *burden of persuasion* to the defendant or require him to come forward with a quantum of proof which is greater than *some,* and (2)

those that place upon the defendant a *burden of production*, or require him to come forward with *some* evidence in rebuttal. The court also held that a rebuttable presumption which requires the defendant to produce some contrary evidence in rebuttal is constitutionally permissible, as long as no reasonable juror could interpret the presumption as shifting the burden of persuasion. In *Allen, supra,* at 157, 99 S. Ct. at 2225, *n.* 16, 61 L. Ed.2d at 792, *n.* 16, the court held that to the extent that a presumption imposes an extremely low burden of production, that is, being satisfied by "any evidence," it may well be that its impact is no greater than that of a permissive inference and it may be properly analyzed as such.

The jury instruction in this case does not state a conclusive presumption and no reasonable juror could interpret it as stating a conclusive presumption. By definition, a conclusive presumption is irrebuttable. It is very apparent, however, that the presumption here may be rebutted; the instruction twice contains the phrase, "When there are no circumstances to prevent or to rebut the presumption." This language clearly tells the jury that the presumption may be rebutted or prevented by any evidence.

Moreover, although the jury instruction in this case states a rebuttable presumption, it is not the kind of rebuttable presumption which would shift the burden of persuasion to the defendant on the intent element of the crime and no reasonable juror could interpret it as such. The instruction requires the jurors to find intent as a natural and probable consequence of the defendant's acts when there are "no circumstances" to the contrary. It does not require the defendant to come forward with an amount of proof greater than "some" evidence. Since the instruction specifically states: "When there are *no* circumstances . . . ," no reasonable juror could inter-

pret it as shifting the burden of persuasion to the defendant.

We conclude the jury could not have interpreted the instruction in this case as constituting either a persuasion-shifting presumption or a conclusive presumption; therefore, the instruction did not deny the defendant due process of law, and is not made invalid by *Sandstrom v. Montana, supra.*

*By the Court.*—Judgment and order affirmed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* I dissent on two grounds: The jury instruction concerning the presumption of intent in this case contravenes sec. 903.03 (3), Rules of Evidence, the state constitution and the federal constitution as interpreted in *Sandstrom v. Montana,* 442 U.S. 510, 99 S. Ct. 2450 (1979). The trial court erred in failing to give an instruction on manslaughter.

I.

The majority appears to concede that that part of the jury instruction which states:

"The law presumes that a reasonable person intends all the natural, probable, and usual consequences of his deliberate acts."

is substantially similar to the Montana jury instruction found unconstitutional in *Sandstrom:* "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." [1]

---

[1] In *Beauregard v. State,* 146 Wis. 280, 288–89, 131 N.W. 347 (1911), which involved the "intent presumption," this court stated that the words "necessary," "natural," "probable," "usual" and "ordinary" are "used as alternatives and substantially as synonyms." There is also no distinction between the meaning of the words "deliberate" and "voluntary" in the context of this pre-

The majority appears to think that the phrase in the Wisconsin jury instructions that "when there are no circumstances to prevent or to rebut the presumption," a phrase which is not in the *Sandstrom* instruction, distinguishes the Wisconsin's instruction from the *Sandstrom* instruction and renders Wisconsin's jury instruction constitutional.

The majority recognizes that if the jury instruction in the case at bar could be interpreted by a reasonable juror as either a conclusive presumption or as a rebuttable presumption which shifts the burden of persuasion to the defendant, the instruction would violate the right to due process. The litmus paper test set forth in *Sandstrom* is not how judges interpret the instruction, but how a "reasonable juror *could* have interpreted the instruction." *Sandstrom*, 442 U.S. at 514, 99 S. Ct. at 2454.

The majority holds that the "jury instruction in this case states a rebuttable presumption"[2] which is a species of "mandatory presumption" (in the *Sandstrom* and *Ulster County Court v. Allen*, 442 U.S. 140, 99 S. Ct. 2213, 2225 (1979) terminology) and which "requires that a trier of fact *must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with *some* evidence to rebut the presumption." (Emphasis is in the majority opinion.) The majority concludes that the instruction "is not the kind of rebuttable presumption which would shift the burden of persuasion to the defendant on the intent element of the crime and no reasonable juror could interpret it as such."

The majority says that the instruction does not state a permissive presumption (which "places no burden of any kind on the defendant,") or a conclusive presumption (an

sumption. Nor is there a difference between "a person" and "a reasonable person" in the context of this presumption.

[2] The majority opinion does not make clear whether its holding is based on Wisconsin law or on how a reasonable juror could interpret the instruction.

irrebuttable presumption). The majority opinion says that "the language [of the instruction] clearly tells the jury that the presumption may be rebutted or prevented by *any* evidence. . . . [The language of the instruction] does not require the defendant to come forward with an amount of proof greater than 'some' evidence."

No Wisconsin appellate judge or federal district court judge who has reviewed the presumption instruction has adopted the interpretation of the instruction which is adopted in the majority opinion. In *Genova v. State,* 91 Wis.2d 595, 283 N.W.2d 483 (Ct. App. 1979), the court of appeals concluded that an instruction similar to the one in issue in this case states a permissive presumption under Wisconsin law and that no reasonable juror could interpret the language otherwise.[3] In *Adams v. State,* 92

---

[3] "Our review of the instructions in this case has led us to the conclusion that they are not constitutionally infirm, and we set forth our reasons for that conclusion as demonstrative of the analysis we made.

"1. The jury was admonished that 'intent . . . must be found *as a fact* . . .' and further admonished that if found at all, it must be found 'from [the defendant's] acts and his words and statements, if any, bearing upon his intent.' Thus, the jury was admonished to consider the evidence in the case and not to rely upon the inference or 'presumption' as a substitute for evidence.

". . .

"15. The instruction presumption language does not direct a finding by the jury, nor does it shift either the burden of production of evidence or the burden of persuasion to the defendant. Thus, there is no compulsion upon the jury to utilize the 'presumption', nor is there compulsion upon the defendant to meet the 'presumption' with evidence refuting the permitted inference of intent.

"16. The presumption language is grounded upon the facts in evidence, not the law. The construction emphasizes consideration of direct and circumstantial evidence that either refutes or establishes the subjective element of intent. Thus, the prosecution's case is grounded upon the facts, not the presumption language.

". . .

"18. We conclude that a reasonable juror, considering the

Wis.2d 875, 887, 289 N.W.2d 318 (Ct. App. 1979), the court of appeals determined that a reasonable juror could have interpreted the instruction as a mandatory rebuttable presumption which shifted "the burden of persuasion" to the defendant. The court concluded in *Adams* that the instruction was unconstitutional.[4] The United

application of the questioned presumption instructions, would not:
"a. be misled about the permissive effect of the instruction;
"b. attribute conclusive effect to the instruction;
"c. believe the state's burden of proof to prove every element of the charged crime beyond a reasonable doubt was diluted or undermined;
"d. believe that the presumption of the defendant's innocence was contradicted;
"e. consider the burden of producing evidence or the burden of persuasion was shifted to the defendant;
"f. consider the instruction directory or binding in the absence of rebutting circumstances.
"We find the challenged instruction not to be a 'mandatory presumption' and find that its permissive effect and nature is not violative of due process under the United States or Wisconsin Constitutions." *Genova v. State*, 91 Wis.2d 595, 615–616, 619, 620, 283 N.W.2d 483 (Ct. App. 1979).

*See also, Cranmore v. State*, 85 Wis.2d 722, 271 N.W.2d 402, 426 (Ct. App. 1978), which was written by the author of the *Genova* case and which was decided before *Sandstrom*. In *Cranmore*, the court of appeals characterized the presumption as "fraught with the peril that a jury may construe an instruction as directive rather than permissive." 85 Wis.2d at 770.

[4] The jury instruction in the present case and in *Adams* repeats the presumption language twice by applying the presumption language specifically to the crime charged. The two-sentence instruction states:
"When there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all the natural, probable and usual consquences of his deliberate acts. If one person assaults another violently with a dangerous weapon likely to kill, and the person thus assaulted dies therefrom, then when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended."

In *Genova*, 91 Wis.2d at 604, n. 4, the court of appeals noted

States District Court for the Eastern District of Wisconsin also declared the instruction unconstitutional holding that a reasonable juror could interpret it as shifting the burden of persuasion. *Dreske v. Wisconsin Department of Health & Social Services,* 483 F. Supp. 783 (D. C. Wis. 1980).[5]

## A.

Because the majority concludes that the instruction creates a mandatory and rebuttable presumption, which shifts to the defendant the burden of producing evidence to rebut or prevent the presumption, the instruction violates sec. 903.03(3), Rules of Evidence.

Under sec. 903.03(3) proof of a basic fact or facts in a criminal case *permits,* but does not *require,* the jury to infer the "presumed" fact or facts. Sec. 903.03(3) requires the trial court to instruct the jury that the "presumption" is not mandatory but is permissive.

Sec. 903.03(3), Rules of Evidence, provides:

"(3) INSTRUCTING THE JURY. Whenever the existence of a presumed fact against the accused is submitted to the jury, the judge shall give an instruction that the law declares that the jury may regard the basic facts as sufficient evidence of the presumed fact but does not require it to do so. In addition, if the presumed fact establishes guilt or is an element of the offense or negatives a defense, the judge shall instruct the jury that its existence must, on all the evidence, be proved beyond a reasonable doubt."

that the jury instruction in that case contained only the first sentence, not the second sentence, and opined that the two-sentence presumption language is "obviously more perilous" than the one-sentence presumption. The court in *Genova* specifically refused to make its decision applicable to the two-sentence instruction. In *Adams* the court distinguished that case from *Genova* on the ground that the jury instruction in *Adams* was the two-sentence instruction. *Adams,* 92 Wis.2d at 892.

[5] The instruction in *Dreske* was of the one-sentence variety. *See* note 4 *supra.*

*See Lofton v. State,* 83 Wis.2d 472, 493, 266 N.W.2d 576 (1978) (Abrahamson, J., concurring opinion) ; *Johnson v. State,* 85 Wis.2d 22, 35, 270 N.W.2d 153 (1978) (Abrahamson, J., concurring opinion) ; and *Genova v. State,* 91 Wis.2d 595, 620, 283 N.W.2d 483 (Ct. App. 1979).

Although I could rest my dissent on this state statutory ground alone, I do not, because I believe that the majority opinion erred in concluding that the instruction passes constitutional muster. I submit that it is commonly recognized that "presumption is the slipperiest member of the family of legal terms, except its first cousin, 'burden of proof' ";[6] that the law uses the word "presumption" in many different ways;[7] that reasonable judges have not agreed as to the reasonable interpretation of the Wisconsin jury instruction in issue; and that a reasonable juror could have interpreted the instruction in issue, which is substantially similar to the *Sandstrom*

[6] McCormick, *Evidence* 802–803 (2d ed. 1972).

Jurors who are not familiar with the legal term "presumption" might very well interpret the word in the same way the word is used in another part of the jury instruction. The word presumption appears in the phrase "presumption of innocence," a phrase generally stressed throughout the trial.

The jury is informed that because of the "presumption" of innocence, the presecution has the burden of proving beyond a reasonable doubt that the defendant is guilty. In this case the jury instructions included the statement: *"The law presumes every person* charged with the commission of an offense to be innocent. This presumption attends the defendant throughout the trial and prevails at its close unless overcome by evidence which satisfies the jury of his guilt beyond a reasonable doubt. The defendant is not required to prove his innocence." (Emphasis supplied.)

Jurors might think that the presumption of intent is similar to the presumption of innocence in that the presumption can be overcome only by the party against whom the presumption operates introducing evidence which satisfies a jury beyond a reasonable doubt.

[7] Laughlin, *In Support of the Thayer Theory of Presumptions,* 52 Mich. L. Rev. 195, 196–207 (1953).

instruction, as shifting the burden of persuasion to the defendant.

## B.

The majority rests its holding that the instruction is constitutional on two grounds: First, that the instruction "does not require the defendant to come forward with an amount of proof greater than 'some' evidence," and second, that "[s]ince the instruction specifically states: 'When there are *no* circumstances . . .' no reasonable juror could interpret it as shifting the burden of persuasion to the defendant." Both grounds are, in my opinion, fallacious. The conclusion reached by the majority that the instruction is constitutional is also, in my opinion, erroneous.

The majority concedes that the jury *must* find the presumed intent upon proof of the basic fact, unless the defendant comes forth with "some evidence." Although the majority opinion is silent as to what evidence constitutes "some evidence" required to rebut the presumption, the implication is that not much evidence is necessary. However the law of this state appears to be otherwise. This court, as early as 1904, said that the defendant has the burden of producing evidence which is "at least sufficiently convincing to raise a reasonable doubt" as to the defendant's intent.

In *Cupps v. State,* 120 Wis. 504, 513, 97 N.W. 210 (1904), which was quoted with approval in *Smith v. State,* 69 Wis.2d 297, 303, 230 N.W.2d 858 (1975), this court said:

"When it is made to appear in the prosecution of a case like this that the accused fired the shot, the weapon being aimed at a vital part of the body, and that death ensued as a natural and probable result, the presumption of fact as to intention to take human life, in the absence

of any explanatory circumstance or evidence, makes a *prima facie* case for the prosecution. The state is not bound to go further and negative any probability that the occurrence was the result of accident, or that there were circumstances reducing the homicide below that of murder in the first degree, or excusing or justifying it altogether. The accused at that point must take up the burden of rebutting the *prima facie* showing made against him. He must show, by evidence at least sufficiently convincing to raise a reasonable doubt as to the intention to take human life or as to whether such taking was justifiable or excusable, that there was no such intention, justification or excuse, or the jury will be justified in finding him guilty of the highest offense of criminal homicide. That rule is elementary."

There is dicta in *Sandstrom*, 442 U.S. at 518, 99 S. Ct. at 2457, that indicates that there might exist a mandatory presumption that would be, by its terms, rebuttable by such a slight quantum of evidence that it would merely shift what is called the "burden of production" of evidence and not the burden of "persuasion" and therefore not violate due process guarantees. However, the United States Supreme Court in *Sandstrom* expressly declined to consider the kind of constitutional analysis which would be appropriate for presumptions other than the conclusive presumption and the mandatory rebuttable presumption which shifts the burden of persuasion. *Sandstrom*, 442 U.S. at 518, 99 S. Ct. at 2457, fn. 8. *See also, Ulster County Court v. Allen*, 442 U.S. 140, 99 S. Ct. 2213, 2224–2225, and 2225, n. 16.

No matter what evidence the majority thinks is "some" evidence and no matter what this court has said previously, the significant fact is that the instruction itself does not tell the jury that any amount of evidence at all will suffice as rebuttal. The instruction requires the jury to examine the evidence, weigh it and decide if it is sufficient to prevent or rebut the presumption. If the

defense fails to provide sufficient evidence to prevent or rebut the presumption the juror could interpret the instruction to mean that the presumption against the defendant stands, whether or not the juror is convinced beyond a reasonable doubt that the defendant had the requisite intent. Under *Sandstrom* such a jury instruction is constitutionally impermissible.[8]

The Wisconsin federal district court in *Dreske* concluded that in light of this court's interpretation of the jury instruction in *Smith* and *Cupps* requiring more than a slight quantum of evidence to rebut the presumption "a reasonable jury might well have assumed that because of the presumption, the burden of proof beyond a reasonable doubt on the element of intent was shifted to the defendant."

A substantially similar line of reasoning was used by the United States Supreme Court in *Sandstrom*. The United States Supreme Court said that although the Montana Supreme Court interprets its presumption as requiring the defendant to produce only "some" evidence, Montana's Rule of Evidence "expressly states that the presumption at issue here may be overcome only 'by a preponderance of evidence.' . . . Such a requirement shifts not only the burden of production, but also the ultimate burden of persuasion on the issue of intent."

---

[8] It would also be reasonable for jurors to believe that the judge would not instruct them on a presumption which was not to be used in the case at hand and that the judge was telling them that there were no circumstances sufficient to prevent or rebut the presumption. Jurors who adopted this interpretation would have given the presumption conclusive effect.

Under one theory of presumption, the trial court does not instruct the jury with regard to the presumption if it determines "that the evidence is sufficient to support a finding contrary to the presumed fact." McCormick, *Evidence* 821. *See also, People v. Hemmer*, 19 Cal. App.3d 1052, 1060–1063, 97 Cal. Rptr. 516 (1971), which held it to be reversible error for the trial court to have instructed the jury as to a presumption when evidence had been introduced to rebut the presumption.

The United States Supreme Court said that the Montana Rule of Evidence serves to show that a reasonable man could interpret the presumption as shifting to the defendant the burden of proving his innocence by a preponderance of evidence. 442 U.S. at 518, 99 S. Ct. at n. 7.

The majority opinion asserts that "[s]ince the instruction specifically states: 'When there are *no* circumstances [to prevent or rebut the presumption],' no reasonable juror could interpret it as shifting the burden of persuasion to the defendant."

Other jurisdictions have concluded that language similar to "when there are no circumstances to prevent or rebut the presumption" renders the presumption instruction more offensive, because this additional language expressly shifts the burden of persuasion to the defendant.

The Connecticut Supreme Court in *State v. Harrison,* 178 Conn. (41 Conn. L.J., No. 9 at p. 5) (1979), found that the jury instruction concerning the presumption of intent "not only parallels the condemned language in *Sandstrom,* but further offends by the use of the clause, 'until some credible evidence comes into the case,' because it is an explicit shifting of the burden to the defendant."

Before the *Sandstrom* decision, several federal courts of appeal expressed disapproval of language similar to our "when there are no circumstances to prevent or to rebut the presumption" language. In *Mann v. United States,* 319 F.2d 404 (5th Cir. 1963), *cert. denied,* 375 U.S. 986 (1964), the following instruction, now known as the *Mann* instruction, was given:

"It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. So unless the contrary appears from the evidence, the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused." 319 F.2d at 407.

The court of appeals in *Mann* reversed the conviction concluding that the clause "So unless the contrary appears from the evidence" shifted the burden of proof from the prosecution to the defendant:

". . . If the charge had ended when the jury was told that a person is presumed to intend the natural consequences of his own acts, when considered in the light of the charge as a whole, there would have been no error. When the words, 'So unless the contrary appears from the evidence' were introduced, the burden of proof was thereupon shifted from the prosecution to the defendant to prove lack of intent. If an inference from a fact or set of facts must be overcome with opposing evidence, then the inference becomes a presumption and places a burden on the accused to overcome that presumption. Such a burden is especially harmful when a person is required to overcome a presumption as to anything subjective, such as intent or wilfulness, and a barrier almost impossible to hurdle results." *Mann v. United States,* 319 F.2d at 409.[9]

[9] *See also, Cohen v. United States,* 378 F.2d 751, 755 (9th Cir. 1967), *cert. denied,* 389 U.S. 897; *United States v. Driscoll,* 454 F.2d 792 (5th Cir. 1972); *United States v. Robinson,* 545 F.2d 301, 305–306 (2d Cir. 1976) ("Thus, the 'natural and probable consequences' charge, particularly when, as here, it contains the phrase 'unless contrary appears from the evidence,' is a burden-shifting charge which has the potential for misleading the jury with respect to the requirement that the government must prove every element of an offense beyond a reasonable doubt."); *United States v. Chiantese,* 560 F.2d 1244, 1255 (5th Cir. 1977) (en banc) ("No district court in this circuit shall include in its charge to the jury an instruction on proof of intent which is couched in language which could reasonably be interpreted as shifting the burden to the accused to produce proof of innocence. This includes charges such as: It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. *So unless the contrary appears from the evidence,* the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly

The Wisconsin instruction which uses the phrase "the law presumes" is more apt to be interpreted as shifting the burden of persuasion than the *Mann* instruction which uses the word "infers."

For the reasons stated, I conclude that a reasonable juror could interpret the Wisconsin jury instruction concerning the presumption of intent as shifting the burden of persuasion to the defendant. The instruction is therefore unconstitutional under *Sandstrom*. The potential harm of the instruction was not removed by the other instructions given at the trial. *Sandstrom*, 442 U.S. at 518, 99 S. Ct. at 4722, n. 7; *State v. Harrison*, 178 Conn. (41 Conn. L.J., No. 9, at 6. I would conclude that in this case the erroneous instruction constituted prejudicial error. *See State v. Sandstrom*, 603 P.2d 244, 245 (Mont. 1979).

## C.

Although the majority recognizes that in 1977 the Uniform Criminal Jury Instructions Committee developed a revised instruction to replace the presumption of intent instruction in issue in the case at bar, the majority expresses neither approval nor disapproval of a trial court's continued use of the presumption of intent instruction. Nevertheless, trial courts of this state should not be misled to think that this court approves the continued use of the presumption of intent instruction. Although the state has argued vigorously (and effectively) in the case at bar that the presumption of intent instruction is constitutional, the state agreed in oral argument that it is advisable that the instruction no longer be used.

In *Genova*, a case in which the court of appeals found the presumption language constitutional, the court of ap-

omitted by the accused.") *See also, Menard v. State*, 578 P.2d 966, 970 (Alas. 1978); *Howard v. State*, 583 P.2d 827, 831–833 (Alas. 1978).

peals wisely advised that "Elimination of presumption language in criminal instructions wherever and whenever possible will avoid the tedious and burdensome analysis of its effect that is necessarily to assure the protection of the rights guaranteed by our Constitutions." 91 Wis.2d at 621.

While the precise language of an instruction is a matter for the trial court to determine, I urge the trial courts to use the instruction proposed by the Uniform Criminal Jury Instructions Committee in 1977 as a model and to make appropriate revision and adaptation of the instruction to fit each case at hand.

## II.

I also disagree with the majority's conclusion that the trial court did not err in refusing to instruct the jury on manslaughter. The majority states that the "evidence does not show 'reasonable, adequate provocation' as would overcome or suspend the exercise of judgment of an ordinary man, since the defendant was aware one month prior to the crime that his wife had a boyfriend who stayed overnight." The trial court did not base its refusal to give the manslaughter instruction on this ground.

The testimony was that Muller's wife had left him on several occasions but that he loved her and always wanted her back. Muller's wife had her own apartment at the time of the killing. Approximately one month prior to the killing Muller's sister told him that she had heard rumors that his wife was "running around on him" and that he should investigate it. The sister testified that at that time the defendant "cut me off and didn't want to hear it . . . . [didn't] believe it." The defendant testified that he did not believe the rumors because he was still staying at his wife's apartment; that he usually worked from about 9 p.m. until 6 a.m.; that he was

usually at his wife's apartment during the daytime hours; and that he never saw another man at the apartment.

During the week of June 25 Muller had worked an earlier shift from about 4:30 p.m. to 12:30 a.m., and on June 25 was allowed to leave about 10 p.m. About midnight of June 25 his sister called and asked him to come over. Muller and his sister met until about 2 a.m. on June 26. Muller's sister told him that his wife was going out with and sleeping with another man named Troxel; that she had learned his name very recently; and that she had recently seen Troxel with Muller's wife. She described Troxel's car to Muller and told Muller that it was often parked in front of the wife's apartment.

Muller testified that in this second discussion with his sister he could tell she was positive about the information, whereas the first time it seemed she was just relating rumors. Muller's sister described his response to the news as "very unhappy," "depressed," "despondent," "terrible state of mind," "devastated," "just absolutely out of it, he was not himself." Muller testified that he was "really upset" and "furious" and he wasn't sure whether to believe the news and he was going to make sure himself. He called his wife from a pay phone and she first denied and then admitted going out with another man. He told her he would come up to talk about it. She told him not to come up, denied that the man was there, and hung up. He drove to her apartment and found the car his sister had described as Troxel's parked in front of the house. He described his reaction as "irate," "furious" and "mad." There was conflicting evidence as to whether Muller brought the gun up to the apartment or whether the gun was in the apartment and Muller and Troxel wrestled for it.

The majority's reasoning that "heat of passion" did not exist is because of its inaccurate view that the only rea-

sonable interpretation of the evidence was that there was approximately a one-month time lapse between Muller learning that his wife was sleeping with Troxel and the death of Troxel. The majority would seem to concede that if Muller had just learned that his wife was sleeping with another man and was confronted with the other man's car parked in front of his wife's apartment and the other man's semi-nude body standing in his wife's bedroom in the middle of the night there would be reasonable grounds for finding that Muller acted in heat of passion.

After reading the record I conclude that although one reasonable interpretation of the evidence is, as the majority states, that "the defendant was aware one month prior to the crime that his wife had a boyfriend who stayed overnight," another equally reasonable interpretation is that he did not really find out about the boyfriend until an hour before the killing. A reasonable construction of the evidence viewed in the light most favorable to the defendant, *State v. Mendoza,* 80 Wis.2d 122, 153, 258 N.W.2d 260 (1977), supports the defendant's argument that the jury be given the opportunity to determine whether there was "reasonable, adequate provocation."

For the reasons set forth, I dissent from the majority opinion.

I have been authorized to state that Mr. Justice Heffernan joins in that portion of this dissenting opinion which discusses the presumption of intent contained in the jury instruction.